**WESTERN UNION TELEGRAPH CO. v.
NATIONAL LABOR RELATIONS
BOARD et al.**
Nos. 236, 237.

Circuit Court of Appeals, Second Circuit.
Aug. 9, 1940.

Francis R. Stark, Gen. Sol., Hines, Rearick, Dorr & Hammond, and John H. Waters, all of New York City (Goldthwaite H. Dorr, Francis R. Stark, Ralph H. Kimball, John K. Watson, and Arthur F. Tripp, Jr., all of New York City, of counsel), for Western Union Telegraph Co., petitioner.

William L. Ransom, James F. Dulligan, Richard Joyce Smith, and P. M. Berkson, all of New York City (James F. Dulligan, of New York City), for petitioner Association of Western Union Employees.

Boudin, Cohn & Glickstein, of New York City (Louis B. Boudin and Sidney Elliott Cohn, both of New York City, of counsel), for American Communications Ass'n.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Ernest A. Gross, Allen Heald, and Joseph B. Robison, all of Washington, D. C., for National Labor Relations Board.

Before L. HAND and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This cause comes on by a petition to review an order of the National Labor Relations Board, "disestablishing" the "Association of Western Union Employees," an unaffiliated union of employees of the petitioner, The Western Union Telegraph Company. The Board petitions for an enforcement order. The occasion for the proceeding was a "charge" filed with the Board by the intervenor, the American Communications Association, a local union of the Congress of Industrial Organization, complaining of the Association on the ground that the Company had "dominated," and still "dominated," it. The Board filed the usual complaint and extended hearings took place, resulting—together with the Board's report—in a record of over 7500 pages. The Board found that the complaint had been proved, and ordered the Company to "disestablish" the Association, and to repay to its members all sums stopped out of their wages and paid over to the Association since July 5, 1935, the date when the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., took effect. In particu-

lar the Board found that the Company had set up the Association in the summer of 1918 as a palliative for its undeviating resistance to any unionization of its employees and had always kept it under its thumb; that for two years after passage of the act it had made no change in their relations; that such changes as it made in August, 1937, were not enough to free the Association from the effects of its origin and long history; and that for this reason it was an unlawful union, whose "disestablishment" was a necessary condition to the free choice of a bargaining agent by the Company's employees. Of the Board's "decision"—an argumentative narrative of more than 150 pages—it is possible to set out only the skeleton; the specific statements of fact are supported by substantial evidence, and the challenge of the Company and the Association goes chiefly to the inferences that the Board drew. To an intelligent understanding of the case we, like the Board, must go back to the origin of the Association.

Before 1918 the Company had been consistently hostile to trade-unions, giving as its justification that they inevitably involved the likelihood of strikes, and that a strike upon its lines would paralyze the whole communication system of the country and do vast damage to its industrial and social life. In that year—the Great War being on—the President had organized the War Labor Board which made certain suggestions to the Company as to collective bargaining that it rejected. However, the President had already taken over the railroads, and it was well understood that the telegraph companies were likely soon to follow; and in the spring of 1918 Carleton, the Company's president, organized a committee to draw up a constitution for a union to be composed only of the Company's employees, which should therefore be unaffiliated with the nation-wide union of telegraphers already in the field. On June 17 he instructed his managers to see to it that delegates should be selected to a constitutional convention to meet in Chicago; and they were duly elected and met in July. Carleton appeared before them on one of the early days, and submitted to them the constitution drawn up by his committee, but said that they were free to take or leave as much of it as they pleased; and this they did, for the actual constitution which they produced after a number of days of discussion, borrowed only in part from his. The point most debated was whether the constitution should contain any provision regarding strikes; and the delegates finally decided not to insert any, but to substitute a provision for arbitration. Carleton had not stipulated that the constitution must not contain any strike procedure; but there was testimony that he had said that he would not commit himself to dealing with any union which reserved such a power, and it·was certainly a permissible inference that it was his known, and often declared, attitude that finally determined the issue. At once after the constitution was adopted Carleton met the president, vice-president and secretary-treasurer of the new Association at Omaha, and on July 25 an agreement was made, which has been the basic contract ever since.

This contract, always thereafter known as the "Omaha Agreement," provided first, that the Company would "prefer for employment" those who were willing "to become members of the Association"; that it would treat with the Association "individually or collectively" as to all "working conditions," so far as concerned any "general schedule of working hours or wages"; and that the agreement should be of indefinite duration, but terminable upon six months' notice. Next came a clause that the members of the Association and the Company recognized that they were engaged in a "continuous public service and that such continuity of service is necessary at all times as well as during the present war emergency" (a stipulation, incidentally, which verged upon a disclaimer of the right to strike). Thereafter followed two clauses giving the individual the right of redress for personal grievances after which an arbitration clause agreed to refer to the Association's board of arbitration "any dispute" touching the meaning of the agreement, or any "working conditions, or wages, which cannot be settled * * * by negotiation." The Association was to be represented upon an employees' committee which had charge of pensions, disability and death benefits, and all officers of the Association were to be "furloughed," while giving any part of their time to it, so as not to lose their seniority. The agreement concluded by declaring that the Company had no control over the Association.

The Board found—and it is hard to see how it could have done otherwise —that the Association by this agreement

agreed to surrender its power to strike. Both sides agree that that alone is no reason for condemning an industrial settlement; but the Board argues that when a union by its own constitution has made itself unable to strike, it cannot freely bargain. We are not prepared to go even as far as that; that is, to hold that a union which, without pressure or inducement from employers, should conclude that arbitration was always a better means than a strike ever could be, could not be a lawful collective bargaining agent under the act. Even though one might look with some jealousy upon such a provision in its constitution—suspecting that it must emanate from employers' influence—there is nothing which forbids it, any more than there is anything which forbids the collective agreement itself not to strike. But the issue here is not merely that, but whether at the outset the Association disclosed any sign of domination by the Company in its structure and in the basic agreement. Considering the known policy of the Company in the past, and particularly the discussions in the convention, of which we have already spoken, the testimony of Miller and League at the hearings, and Carleton's draft of the Omaha agreement, it seems to us pretty clear that the constitution and the agreement took the form they did, because the delegates supposed that unless the right to strike was given up, the Company would not recognize the Association. (We do not forget that Carleton's draft did contain language which amounted to an agreement not to strike and that this was left out; but we think that the agreement to arbitrate all questions was the equivalent.) The Board was therefore justified in concluding that the Association had been coërced at the outset in the conditions upon which it might act as the collective bargaining agent of the employees.

During the next seventeen years the Company did much to foster the growth and standing of the Association. As provided in the Omaha agreement its members were preferred to others in getting and holding jobs; it was allowed free use of the Company's bulletin boards—an important means of publicity—and the Company always provided free transportation for the delegates in going to and coming from Association meetings. (This it did by means of railroad passes, given upon the theory that the delegates were travelling upon company business, itself a somewhat suggestive justification for the practice.) For the first few years it went further, and paid the delegates for their time, and that was an important help at a critical period, as the Association recognized. The Company's officials sent out word generally that employees should be told that "membership was more or less an obligation on employees accepting benefits that the Association has been instrumental in securing"; and the Company distributed the Association's publications and furnished it with lists of employees to be used for recruiting. In some cases at least, applicants for jobs were asked to sign an application blank, coupled with the suggestion that they might find it in their interest to join. The Company consented to collect fees for the Association by the "check-off" of such members as asked it to do so, though never without request. Until 1933 while these encouragements were going on, the Company continued to discharge all employees found to be members of another union, and it employed spies to learn who were such members. Specific authority from the responsible officials for some of these practices is not indeed in the record, and the rule applies, here as elsewhere, that nothing is to be charged against a principal, which is not within the scope of the agent's authority. Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 762. But the general instructions from the vice-president to the general managers, coupled with the known policy of the Company to confine union activities to the Association, were enough to justify the inference that the subordinates' acts were more than spontaneous efforts of members to strengthen their union. The Company tried also to make sure that the Association should be credited with any wage rises or other advantages granted to the men—at times even when no credit was really due to it. This was described as "tying in" the Association with the gains achieved; it was avowedly to give stronger standing to the Association by increasing its popularity. Originally the Association had not wished to enroll messengers; as a class they were very largely boys, and the "turnover" among them was abnormally high, their average length of service being no more than ninety days. After the depression, however, when jobs became scarcer, messengers stayed longer, and in 1933 an affiliate of the American Federation of

Labor started to organize them. The Company did not like this, and advised the Association to try to meet it by recruiting the boys in the large cities, these being "most·susceptible to labor agitation."

Such in the briefest outline was the position of the Association on July 5, 1935, when the act was passed. The Company's officials had for some time been aware that there was a growing feeling against "company unions," and although the Association was not one of these in the sense that the employer had any representatives on its governing bodies, both it and the Company were concerned lest the favors it had received might appear to compromise its independence and its continued countenance as the exclusive bargaining agent of all the employees, with the possible exception of the messengers. However, the validity of the act was still uncertain, and no significant change took place in the relations of the parties until in 1937 the Board started a . proceeding against the Company in Seattle. This arose out of a conflict between it and a local of the Commercial Telegraphers' Union, which asserted that it was entitled to be the bargaining agent for the messengers at that place. (The Board had ruled that the messengers were an appropriate bargaining unit.) The Company accepted a compromise of this controversy by recognizing this union as the exclusive representative of all the messengers employed at Seattle. Presumably because the Supreme Court had declared the act valid, and certainly in part because of this experience, by the summer of 1937 the Company felt that it must make its relations with the Association less vulnerable. On August 17, 1937, the president wrote to all vice-presidents and to the comptroller that all those in a supervisory capacity must receive copies of the Wagner Act, and be told of the Company's desire to comply with it. In particular they must in the future deny to the Association any use of Company bulletin boards, or machines for typing and mimeographing; Association members must not recruit new members on Company time, or meet on Company premises, and officials must not prefer members for employment. This was followed in October by a further request that all employees in a supervisory capacity should either resign from the Association, or cease to supervise. It is open to doubt how far some of these instructions were carried out; for example, in November,

1937, one official of the Association, Farren, seems still to have supposed that preferences were accorded members. At any rate the Company at no time took any action to declare publicly to all its employees that the act had completely changed its relations with the Association; that, so far as the old constitution might be considered as not allowing any right to strike, it was at an end; that it proposed for the future not to allow preferences or any other favors to members; that, while it would continue to treat the Association as the collective bargaining agent of its employees, the Association must stand upon its own feet, and meet the competition of the great affiliated unions; and that in that competition the Company would stand rigidly aside, accepting whatever might result with equal grace, and making no distinction in its treatment between those who electioneered for one side or the other.

 We think that some such absolute and public cleavage between the old and the new was a condition upon further recognition of the Association. So we read National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Company, 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219; and National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396. It is true that in those cases the unaffiliated union had had employer's representatives on its governing bodies; but that was merely an incident, not a test. The theory on which the Supreme Court went, as we understand it, was that an unaffiliated union, known for long to be favored by the employer, carries over an advantage which necessarily vitiates its standing as exclusive bargaining agent. It cannot remain such until measures are taken completely to disabuse the employees of any belief that they will win the employer's approval if they remain in it, or incur his displeasure if they leave. National Labor Relations Board v. Fletcher Co., 1 Cir., 108 F.2d 459, 467; National Labor Relations Board v. Brown Paper M. Co., 5 Cir., 108 F.2d 867, 871; Heinz & Co. v. National Labor Relations Board, 6 Cir., 110 F.2d 843, 847, 848; National Labor Relations Board v. Greenbaum T. Co., 7 Cir., 110 F.2d 984, 987, 988; Westinghouse Electric & Mfg.

Co. v. National Labor Relations Board, 2 Cir., 112 F.2d 657. What measures will be enough nobody can of course say in the abstract; primarily, the Board is to judge, and the record would not justify our holding that what was here done inevitably had the desired effect. We should indeed hesitate to say with the Board that the Association was an abject creature of the Company; it had had a history of controversies which seem entirely genuine, so far as the record goes, and which appear to have resulted in substantial gains. We can see no justification for putting these aside as sham battles. But it is not necessary that we should pass upon that; it is enough if the record supports a finding that the Company did so far foster or control the Association that its employees were likely on that account to prefer it to outside unions. Nor is it true that this involves the conclusion that no union of the employees of only one employer could possibly endure after July 5, 1935. It is indeed true that the act does not mean to perpetuate continuous industrial warfare, and that a long history of mutual forbearance and compromise need not impugn the independence of a union. But it is one thing freely to come to a peaceful accommodation, and another to secure accommodation through a membership made and kept complaisant from the start. If it be once shown that the composition and constitution of a union are the result of the spontaneous uninfluenced will of his employees, an employer may bear his full weight upon it; but he may not seek to influence them to join or not to join a given union, and he may have no hand in its internal structure or management. We hold therefore that the Board had warrant in the evidence for concluding that the Company had interfered in these regards, and had not cleared away the past by anything it did after July 5, 1935. We therefore affirm Articles I (a), I (b), I (c), and I (d) of the order, and Articles II (a) and II (c).

 There remains Article II (b) which directed the Company to refund to employees all moneys stopped out of their wages after the act went into effect. The Board regarded this as a part of the "affirmative action" authorized by § 10 (c), 29 U.S.C.A. § 160 (c); the argument being that, although the money was in every instance stopped at the employee's request, the consent was nevertheless procured by duress and the court should disregard it, treating the payment as a wrong to the employee for which the Board may enforce restitution. We cannot agree. Certainly the Company was not a constructive trustee of the money, for it passed it along to the Association at once; and, while the mere existence of the Association may in some sense be thought to have been an advantage to the Company, that is too imponderable to be set off against the fees. If the Company is to be liable at all, it must be on the theory that it is liable in damages for the tort of compelling the members to contribute through the coërcion of an unlawful act, an "unfair labor practice." That argument is as good in the mouths of those employees who paid their dues directly as it is in the mouths of those whose wages were stopped. It is no answer to say that the Board has no jurisdiction over the Association; it needed none; it made no difference how the loss occurred, for the coërcion was the same. Nor will it do any good to assume—as we do arguendo—that under the guise of "affirmative action" the Board may make itself the vicarious representative of each employee who may have in fact suffered pecuniary damage; the vice is that the act did not create a mass tort by which either a particular employee, or the Board for all, could dispense with the proof that the "unfair labor practice" actually impinged upon the putative victims and caused them pecuniary damage. It by no means inevitably follows, because an employer has so conducted himself towards a union as to disqualify it from acting as a collective bargaining agent for all his employees, that he has inflicted pecuniary damage upon each member of that union. Here at any rate there was no evidence that all those who asked to have their wages stopped, did so in any part because they were coërced. So far as appears, many of them may have liked the Association for its own sake, quite independently of anything that the Company did to coax or compel them to join; they may have preferred it to any alternative then available; either to an affiliated union, or to no union at all. As we have said, it was by no means valueless to them; presumably it gave them a hearing upon their individual grievances, and a mouthpiece through which they could press their collective claims; even if it did not do so as ardently as it should. Even though it be true that each employee was denied a

right secured by the statute to him personally; i. e. the right to bargain collectively through an untrammelled agent; the measure of his damages for that wrong is not the fees which he paid to the Association. It may be that so to construe the statute, will make difficult recovery by those employees who were in fact coërced into paying their dues, if there were any. Certainly it does require each one to prove his case; but there is nothing exceptional or unjust in that; at least the difficulty cannot excuse sweeping all into one net, the victims and the unharmed together. It appears to us that this article of the order can be defended only on the theory that the Board has punitive powers, which it has not, and indeed does not claim.

The foregoing disposes also of the Association's petition to review.

Orders affirmed except article II (b) which is reversed.

An order of enforcement will go upon the orders as modified.