PERRY COAL COMPANY and Peabody Coal Company et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

UNITED MINE WORKERS OF AMERICA et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 12889, 12915.

United States Court of Appeals Seventh Circuit.

Dec. 2, 1960.

Rehearing Denied Jan. 17, 1961.

Schnackenberg, Circuit Judge, dissented in part.

Mo., M. E. Boiarsky, Charleston, W. Va., Welly K. Hopkins, Washington, D. C., Edmund Burke, Springfield, Ill., Harrison Combs, Washington, D. C., V. Lee McMahon, St. Louis, Mo., Sidley, Austin, Burgess & Smith, Chicago, Ill., Guffey & McMahon, St. Louis, Mo., of counsel, for petitioners.

Thomas J. McDermott, Associate General Counsel, Louis Schwartz, Attorney, N. L. R. B., Washington, D. C., Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Brian S. Ahearn, Attorney, N. L. R. B., Washington, D. C., for respondent.

Before DUFFY and SCHNACKENBERG, Circuit Judges, and MERCER, District Judge.

DUFFY, Circuit Judge.

Appeal No. 12889 is before this Court upon the petition of Peabody Coal Company (Peabody) to review and set aside an order of The National Labor Relations Board [1] issued against Peabody and also against the petitioners in appeal No. 12915.

Appeal No. 12915 is before the Court upon petition of the United Mine Workers of America, its District 12, and its Local Unions 1227 and 1229, to review and set aside the same order of the Board. In its answer which applies to both appeals, the Board has requested enforcement of its order.

The charging party is the Progressive Mine Workers of America. Among the sections of the Labor Management Relations Act claimed to have been violated are: Sections 8(a) (1); 8(a) (2); 8(a) (3); 8(a) (5); 8(b) (1) (A) and 8(b) (2), 29 U.S.C.A. § 158(a) (1–3, 5), (b) (1) (A), (2).

No employee of either of the coal mines hereinafter described complained of any coercion or discriminatory conduct. Fundamentally, this is a struggle between the Progressive Mine Workers of America (Progressive) and the United Mine Workers of America (UMW) with

Howard P. Robinson, Chicago, Ill., William F. Guffey, Paul C. Zempel, St. Louis,

---

[1]. 125 N.L.R.B. No. 110 (Dec. 30, 1959).

the employer, Peabody, being more or less in the middle.

For many years prior to the summer of 1957, Progressive and its Local 167, represented employees of Midwest-Radiant Corporation (Midwest) at the Millstadt mine, and Progressive and its Local 75 represented employees of Perry Coal Company (Perry) at the O'Fallon mine. This representation was accomplished by means of labor agreements between Progressive and its Locals 167 and 75 and Coal Producers Association of Illinois of which Perry and Midwest were members.

For many years prior to the summer of 1957, Peabody, as a member of the Illinois Coal Operators Association, had recognized UMW as the exclusive bargaining representative at twenty-seven other mines which it owned and operated in Illinois and other parts of the country. The collective bargaining agreement included the National Bituminous Coal Wage Agreement of 1950 as amended, and the Wage Agreement and Working Conditions of District No. 12.

The 1952 amendment provided that the Agreement covers the operation of all of the coal lands owned or held under lease by the coal operators, or acquired during the term of the contract. This amendment was carried forward and preserved by the 1956 amendment which provided that the Agreement covered all of the bituminous coal mines owned or operated by the coal operators who were parties to the agreement.

Through a process of liquidation and merger occurring about October 3, 1957, the properties of Perry and Midwest became the properties of Peabody. The only employer now involved in these proceedings is Peabody.

In May or June, 1957, which was after Peabody acquired control of the Millstadt and O'Fallon mines, Hugh White, president of UMW's District 12, notified Hartman general mine superintendent of Peabody, and McCollum, a vice president of Peabody and formerly a vice president of Perry, that Peabody must comply with the provisions in the National Bitumi-

nous Coal Wage Agreement by recognizing UMW and applying the terms of the contract at the Millstadt and O'Fallon mines. His demand was not based upon a claim that District 12 represented any of the employees at these mines.

McCollum and Hartman agreed the contract applied to all Peabody operations, and stated that they would apply the contract as a matter of course when their contract with Progressive expired, and when UMW could show that it represented a majority of the employees.

In May or June 1957, White obtained from Hartman a list of the names and addresses of the employees of the Millstadt mine, and obtained from McCollum a similar list of the employees at the O'Fallon mine. Both Hartman and McCollum knew UMW planned to attempt to organize the employees of the two mines. Hartman testified that such lists which were partially incorrect, had been previously furnished to charity organizations, manufacturers' representatives, insurance men and others.

On July 1, 1957, White sent letters to all employees at both mines. At this time the mines were closed down for the annual vacation period. The letters recited that UMW had served notice on Peabody that it must comply with the provisions in the National Bituminous Coal Wage Agreement, and that all provisions of that contract be applied at the Millstadt and O'Fallon mines. It invited all employees to become members of UMW, and enclosed a membership card upon which it requested the signature of the person addressed.

On July 4, 1957, Roy Dupee, president of Progressive's District No. 1, wrote Peabody, cautioning it to comply with the Progressive agreement and the wishes of "your employees as to Union affiliation." Peabody did not reply to Dupee's letter. Dupee made numerous telephone calls to Peabody at St. Louis to ascertain the company's position concerning the demand of UMW. No one in authority would or did answer.

The annual vacation period at both mines was scheduled from June 28 to and

including July 8. However, at Millstadt, certain repair work was in progress, and the opening date there was re-scheduled to July 15th. The mine did reopen on July 20th. O'Fallon was reopened on July 22nd.

While the mines were closed, Peabody withdrew from the Coal Producers Association of Illinois, and also gave notice to Progressive that it would terminate the contract between them on September 30, 1957. On August 4, 1957, Dupee wrote Peabody protesting Peabody's contemplated termination of the agreement, and requested Peabody to meet with Progressive as the employees' bargaining representative to negotiate a new agreement. Peabody did not respond to this request to bargain. On September 30, 1957, Peabody terminated its contract with Progressive and ceased making payments to the Progressive Welfare and Retirement Fund. On October 1, 1957, Peabody recognized UMW, and applied the UMW contract at the Millstadt and O'Fallon mines.

The Board adopted substantially all of the trial examiner's conclusions and recommendations. The Board found Peabody violated Section 8(a) (2) and (1) by assisting and supporting UMW, a) by furnishing UMW with lists of its employees at the two mines; b) by discriminatorily locking out employees at Millstadt from July 15 to July 20, 1957, and at the O'Fallon mine from July 9 to July 20, 1957, in order to encourage membership in UMW; c) during the periods of lockouts, threatening employees with continued lockout; d) by refusing to bargain with Progressive; e) by terminating the bargaining agreement with Progressive on September 30; f) by discontinuing payments to Progressive's Welfare and Retirement Fund on September 30; g) by entering into an exclusive bargaining contract with UMW at a time when that Union did not represent an un-coerced majority of employees; and h) by entering into a contract containing illegal closed shop provisions. The Board also found the conduct of Pea-

body violated Section 8(a) (3) and (5) of the Act.

The Board found and determined UMW violated Section 8(b) (1) (A) and (2) of the Act by demanding Peabody enter into a collective bargaining agreement with it; by its letter of July 1, 1957, addressed to each employee of the two mines; and by its newspaper ad addressed to mine employees stating UMW was requiring Peabody to apply the provisions of the UMW contract at the two mines and by entering into contracts containing illegal Union-security provisions.

Peabody claims and offered testimony tending to prove that the reopening of the Millstadt mine was delayed for economic reasons, and the reopening of the O'Fallon mine was delayed for safety reasons, but the trier of the facts found otherwise. The examiner and the Board relied to a considerable extent upon statements made by vice president McCollum, general superintendent Hartman, and mine superintendent Schroeder, to the effect that the mines would not reopen and operate unless UMW was designated as bargaining representative by the employees.

True, these officers denied making many of the statements relied upon, but we cannot disturb credibility resolutions made by the Board. N. L. R. B. v. Wagner Iron Works, 7 Cir., 220 F. 2d 126, 142. The weight to be attached to and the credibility to be accorded testimony is a matter for the trier of the facts. Sunshine Biscuits, Inc. v. N. L. R. B., 7 Cir., 274 F.2d 738, 741.

The trial examiner found the furnishing of the mailing lists to UMW did not "constitute unlawful assistance to United and interference within the meaning of the Act. * * *" The Board disagreed. It did not say the furnishing of the lists was illegal *per se*, but that the furnishing of the lists in the context of other acts of assistance constituted illegal assistance, citing Wagner Iron Works, 104 N.L.R.B. 445, enforced, N. L. R. B. v. Wagner Iron Works, 7 Cir., 220 F.2d 126.

914

We think the furnishing of the lists by itself would be no basis for the conclusion of the Board. Even considered with other acts of assistance, it is a slender reed on which the Board in part rests its decision. Although of relatively small importance in this case, we are not disposed to interfere with the Board's decision as to the effect of furnishing the lists.

■ The National Bituminous Coal Wage Agreement of 1950 contains the following provision: "It is further agreed that as a condition of employment all employees shall be, or become, members of the United Mine Workers of America, *to the extent and in the manner permitted by law.*" (Emphasis supplied)

An integral part of the same printed document which contains the above quoted provision is: "Wage Agreement and Working Conditions between the Illinois Coal Operators Association and The International Union United Mine Workers of America and District No. 12, United Mine Workers of America." This agreement bears the effective date of April 1, 1941 and provides that it remains in full force and effect in its provisions " * * * except where they have been amended, modified and or nullified by the National Bituminous Coal Wage Agreements incorporated in this book."

The trial examiner found the requirement of UMW membership contained in the 1941 district agreement was an integral part of the UMW's National Bituminous Coal Wage Agreement and concluded that it provided for an unlawful closed shop. The Board agreed, but went further and held the Union security clause in the 1950 agreement provides for an unlawful closed shop in spite of the provision " * * * to the extent and in the manner provided by law." Such a holding is contrary to our decision in Lewis v. Quality Coal Corp., 270 F.2d 140.

The Board seeks first to distinguish Quality Coal on the ground that that case involved private litigation. It then asks us to reconsider our decision in Quality Coal, and cites the same cases which this

Court considered and rejected when it handed down the Quality Coal decision.

It is entirely immaterial that Quality Coal arose in the context of private litigation. The question that was fully litigated in that case was decided adversely to the present position of the Board.

We decline the cordial invitation of the Board to abandon our decision in Lewis v. Quality Coal Corporation. We adhere to that decision. For whatever significance it may have, it also is of interest to note that the United States Supreme Court denied certiorari in Quality Coal, 361 U.S. 929, 80 S.Ct. 369, 4 L.Ed.2d 353.

■ We are of the view and hold that the Board was in error in holding the 1941 agreement, which provided for a closed shop, was not amended or modified by the 1950 agreement. It seems clear that the contracting parties contemplated that changes might be necessary under the law, and evinced a desire to conform to such changes.

The intention of the parties is also shown by the manner in which employment practices were carried out at the two mines. No employee claims his rights under Section 7 were violated. Furthermore in the transition from Progressive to UMW, no employee at either mine lost his job. Membership in UMW was not a condition of employment. An employee did not need to belong to UMW to retain his employment.

■ Where two constructions of a written contract are possible, preference is given to that one which does not result in a violation of law. Great Northern Railway Co. v. Delmar Co., 283 U.S. 686, 691, 51 S.Ct. 579, 75 L.Ed. 1349.

The National Agreement by its own terms prevails over the District Agreement. The clear and unequivocal phrase in the National Agreement renders inoperative the union security provision of both agreements.

We hold the Board was in error in finding and concluding Peabody violated Section 8(a) (1) and (3) of the Act by entering into and maintaining a contract

which contains closed shop provisions, and that UMW violated Section 8(b) (1) (A) and (2) of the Act by demanding, entering into and maintaining a contract which contained closed shop provisions.

■ The Board's order requires that Peabody and UMW jointly and severally "reimburse all employees for moneys illegally exacted from them" and to "make whole employees for any loss suffered by reason of the discriminatory discontinuation of the Progressive Fund payments." An issue which we must decide is whether such, a remedy is appropriate under the facts of this case.

The Supreme Court discussed the power of the Board to order affirmative remedies in Republic Steel Corp. v. N. L. R. B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6. The Court there stated, at page 11, of 311 U.S., at page 79 of 61 S.Ct.: " * * * We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. We have said that 'this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.' * * * (citing cases)."

In Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568, the Supreme Court held that reimbursement of dues was an appropriate remedy to effectuate the purposes of the Act. However, the Court expressly limited the decision in that case to the particular facts before it, and refused to express an opinion on the merits of eleven cases in five different circuits which refused to enforce similar Board orders. It is of interest to note that the Virginia case concerned a company-dominated union, and all the employees had to join the union and remain members thereof in order to retain their jobs.

In Western Union Telegraph Co. v. N. L. R. B., 2 Cir., 113 F.2d 992, the Court refused to enforce a refund order similar to the one here under consideration. The Court said at page 997: "It by no means inevitably follows, because an employer has so conducted himself towards a union as to disqualify it from acting as collective bargaining agent for all his employees, that he has inflicted pecuniary damage upon each member of the union. * * * "

In his concurring opinion in the Virginia case, supra, Justice Frankfurter pointed out the significant distinction between cases like Western Union and Virginia. He said, 319 U.S. at page 545, 63 S.Ct. at page 1221: "But the vital difference between the Western Union and this case is that, in the former, 'there was no evidence that all those (employees) who asked to have their wages stopped, did so in any part because they were coerced.' * * * Here the employees had no such choice; they could avoid the check-off of union dues only by giving up their jobs."

In Local 357, International Brotherhood of Teamsters, etc. v. N. L. R. B., 107 U.S.App.D.C. 188, 275 F.2d 646, the Court refused to enforce a dues reimbursement order except as to an individual who was actually discriminated against by the illegal hiring-hall agreement. The Court said the order went too far in directing reimbursement to all casual employees.

It is the Board's view that the presumption of coercion is conclusive once the unfair labor practice is shown. However, in N. L. R. B. v. United States Steel Corp., 3 Cir., 278 F.2d 896, the Court refused to accept this argument and declined to enforce the order because there was no evidence that any employee was coerced. The Court was under the impression that this Court had decided to the contrary in N. L. R. B. v. Local 60, United Brotherhood of Carpenters, 273 F.2d 699, but stated, at page 901 of 278 F.2d: "there is a growing body of authority, some of it very force-

fully and clearly written, supporting our views."

In N. L. R. B. v. Local 60, United Brotherhood of Carpenters, this Court approved the Board's finding that the contract contained an unlawful closed shop clause. The Board ordered reimbursement and this Court said it was a proper remedy because the "record does support the Board's finding that such fees were coerced in that there was present an implicit threat of loss of job if those fees were not paid." 273 F.2d at page 703. Significantly, the opinion went on to hold, "The burden rested on the respondents to show that even without the unlawful discrimination, the Company's employees would have maintained their membership in Local 60." 273 F.2d at page 703. The Supreme Court has recognized the contrary holdings of our Local 60 opinion and that of the District of Columbia Court of Appeals in the Local 357 case, and has granted certiorari in both cases. 363 U.S. 837, 80 S.Ct. 1610, 4 L.Ed.2d 1723.

Of course, we shall follow the decision of this Court in the Local 60 case if it is controlling under the facts of the instant case. For the reasons hereinafter stated, we hold that our decision in Local 60 is not controlling in the case at bar.

In Local 60, not only was the hiring agreement found to be unlawful, but two employees were declined employment by reason thereof. This Court found reimbursement of dues proper "to restore employees to the position they would have enjoyed but for the illegal practices." 273 F.2d at page 703.

By contrast, in the case at bar, there are no findings that dues were paid under coercion or under any threat or implied threat of loss of job. In the instant case, no employee did lose his job in the change-over to UMW. No employee complained or testified that he was coerced into signing dues cards. There is clear evidence in the record that membership in UMW was not a condition of employment. Furthermore, at the time of the contract with Peabody, employees at both mines, by cards, and by election at O'Fallon, indicated their choice of UMW.

In the great majority of cases raising the issue of dues reimbursement, only one union was involved. In such cases, were it not for the unfair labor practices, it is quite possible the employees involved would not have paid any dues. Here the employees were all union men. True, they had been members of Progressive and not UMW, but during the period that UMW collected its dues, the employees received all of the rights and benefits of belonging to UMW. These employees would have paid union dues regardless of any unfair labor practices.

Inasmuch as there are no findings of actual coercion in the instant case nor any evidence which would have supported such findings, we hold that part of the order requiring reimbursement of dues paid, should not be enforced.

We next consider the requirement of the order that Peabody and UMW jointly and severally "make whole employees for any loss suffered by reason of the discriminatory discontinuation of the Progressive Fund payments." We note that payments were made by Peabody into that fund during the entire duration of the contract with Progressive. To say that at the time the old contract expired, a new contract would have been entered into with Progressive, would seem to be sheer speculation. The General Counsel asked the trial examiner to reinstate Progressive's contract but he refused to do so. The Board makes no mention of this part of the examiner's intermediate report, so we assume the Board adopted the action of the trial examiner in that respect. Nevertheless, the Board's order, in effect, reinstates at least part of Progressive's contract.

Since October 1, 1957, Peabody has paid into UMW Welfare and Retirement Fund, royalty payments of 40 cents a ton for every ton which it has sold from the O'Fallon and Millstadt mines. If it had made payments into the Progressive Fund, the amount would have been 20 cents a ton. There should be no windfall

to employees which might enable them to draw from both funds for the period when they would be entitled to receive payments from one or the other. Such part of the Board's order is penal in effect and should not be enforced.

■ UMW claims the order is too broad. It specifies three objections: 1) Paragraph 2(a) (3) of the order is merely a command to broadly obey the statute; 2) the order and notice should be limited to the employees of the two mines involved; and 3) the inclusion of "any other employer" is invalid in paragraph 2(b) (3) of the order.

The Board has the power to make an order like paragraph 2(a) (3), N. L. R. B. v. Cheney California Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739. Whether it is justified depends on the circumstances of each case. N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. The Board argues the reason for the paragraph was that the illegal contract covered all Peabody employees. But, since we hold the contract is valid, the order should be limited to UMW's and Peabody's actual unfair labor practices in this case.

Under the authority of N. L. R. B. v. United Brotherhood of Carpenters, 7 Cir., 276 F.2d 694, the order should be limited to the employees of the two mines involved.

■ The words "or any other employer" in paragraph 2(b) (3) of the order should not be enforced. Communications Workers of America, A. F. L.-C. I. O. v. N. L. R. B., 362 U.S. 479, 80 S.Ct. 838, 4 L.Ed.2d 896. UMW was not found to have engaged in violations against the employees of any employer other than Peabody. In any event, the whole clause should be stricken since the contract did not violate the Act.

The Order of the Board, modified as indicated in this opinion, will be enforced.

SCHNACKENBERG, Circuit Judge (dissenting in part).

For the reasons set forth in my opinion in Lewis v. Quality Coal Corp., 7 Cir., 270 F.2d 140, 144, I dissent from those parts of Judge DUFFY'S opinion which are inconsistent with my said views.

In all other respects I concur with his opinion.