319 F.2d 428
 INTERNATIONAL UNION, PROGRESSIVE MINE WORKERS OF AMERICA,
and Local No. 403 Progressive Mine Workers of
America, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
CENTER POINT BLOCK COAL CORPORATION, an Indiana Corporation,
Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
QUALITY COAL CORPORATION, Brazil Block Coal and Clay Co.,
Inc., and Carl F.Kumpf, Respondents.
 Nos. 13991, 14001, 14043.
 United States Court of Appeals Seventh Circuit.
 June 17, 1963, Rehearing Denied En Banc Aug. 15, 1963.
(Swygert, C.J., votedfor rehearing).
 
 G. William Horsley, Robert F. Vespa, Richard L. Lott, Springfield, Ill., George V. Gardner, Gardner & Gandal, Washington, D.C., for International Union, Progressive Mine Workers of America, and Center Point Block Coal Corp.
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Hans J. Lehmann, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Washington, D.C., for National Labor Relations Board.
 Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.
 CASTLE, Circuit Judge.
 
 
 1
 These cases are before the Court on the petition of International Union, Progressive Mine Workers of America, and Local No. 403 Progressive Mine Workers of America[1] (Case No. 13991) and the petition of Center Point Block Coal Corporation[2] (Case No. 14001) filed pursuant to Section 10(f) of the National Labor Relations Act,[3] as amended, (29 U.S.C.A. 160(f)) to review and set aside an order of the National Labor Relations Board[4] and upon the Board's petition under Section 10(e) of the Act (Case No. 14043) for the enforcement of that order.
 
 
 2
 The charges before the Board were filed by Local 7365, United Mine Workers of America.[5] None of the employees of Center Point were complainants.
 
 
 3
 The Board found and concluded, inter alia,[6] that Progressive violated Section 8(b)(1)(A) of the Act[7] and that Center Point violated Section 8(a) (1), (2), (3) and (5) of the Act.[8] The Board found that Progressive violated Section 8(b)(1)(A) by entering into a collective bargaining agreement with Center Point providing for exclusive representation at a time when Progressive did not represent an uncoerced majority of Center Point's employees and by receiving monies deducted and remitted by Center Point as union fees and dues pursuant to that agreement.[9] The Board found that Center Point refused to bargain with UMW in violation of Section 8(a)(5); unlawfully assisted and supported Progressive, and carried on negotiations for the purpose of concluding and entered into a collective bargaining contract with Progressive at a time when that union did not represent an uncoerced majority of the employees involved, in violation of Section 8(a)(1)(2) and (5); and engaged in an illegal hiring practice in violation of Section 8(a)(1) and (3) by requiring membership in Progressive as a condition of employment.
 
 
 4
 The Board's order in so far as it applies to Center Point requires that it cease and desist from the unfair labor practices found, or in any other manner interfering with, restraining and coercing its employees in the exercise of their rights under the Act. Affirmatively, the order directs Center Point to withdraw and withhold recognition from Progressive until it is certified by the Board; upon request to bargain collectively with UMW; jointly and severally with Progressive to reimburse all employees for dues and assessments together with interest at the rate of 6 per cent per annum; and to post designated notices. The order requires Progressive to cease and desist from giving effect to the collective bargaining agreement entered into with Center Point; from acting as the collective bargaining agent of Center Points, employees until certified by the Board; and from restraining or coercing in any like or related manner the employees of Center Point in their exercise of rights guaranteed by Section 7 of the Act. Progressive is directed to jointly and severally with Center Point make reimbursement to the employees of dues and assessments with interest, and to post designated notices.
 
 
 5
 The contentions advanced by Center Point and Progressive as grounds for setting aside the Board's order and denying its enforcement require determination of the following contested issues:
 
 
 6
 ( 1) Whether the volume of interstate shipments from Center Point's operations is such that the Board properly asserted jurisdiction over it.
 
 
 7
 (2) Whether with respect to the employees involved Center Point is a successor employer to Quality Coal Corporation.
 
 
 8
 (3) Whether Center Point unlawfully assisted and supported Progressive.
 
 
 9
 (4) Whether Center Point by an unlawful hiring practice conditioned employment on membership in Progressive.
 
 
 10
 (5) Whether the employees' membership in Progressive and payment of dues and assessments were the result of coercion.
 
 
 11
 (6) Whether the Board's order in so far as it requires Center Point to bargain with UMW and directs the refunding of dues and assessments, with interest, is authorized and proper under the facts and circumstances of the case.
 
 
 12
 We have carefully reviewed the record, the intermediate report of the trial examiner, and the decision and order of the Board. Our review, in so far as factual findings of the Board are concerned, is limited to a determination of whether or not those findings are supported by substantial evidence on the record considered as a whole. Board findings so supported are conclusive. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 487-488, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 13
 With that rule in mind the following summarization of facts and circumstances upon which the Board's findings and conclusions are based will serve as a preface to a consideration of the issues involved.
 
 
 14
 The Center Point strip mine, located near Center Point, Indiana, was operated, at least since 1955, by Quality Coal Corporation on lands owned or leased by Brazil Block Coal and Clay Co., Inc. Brazil received payments from Quality based on tonnage mined. By January 1958, Brazil had become the owner of Quality's assets and from then until May 31, 1961, Quality operated the mine through an arrangement under which it used Brazil's equipment, Brazil sold the coal, and Quality was paid on a cost-plus basis. During this period Carl F. Kumpf,[10] the president of both companies and a major stockholder of Brazil,[11] which had acquired all of the stock of Quality, was in sole charge of their operations. He handled the companies' employee relations, and negotiated and signed labor agreements, without consulting any of the other officers or directors.
 
 
 15
 For many years, Quality recognized the UMW as the bargaining representative of its production employees at the mine, including truck drivers, and through May 31, 1961 all employees in the unit were members of the UMW. On March 31, 1961, Quality ceased mining operations and gave UMW notice terminating the current collective bargaining agreement effective May 31, 1961, and by that date Quality had terminated all 36 employees covered by the contract. The UMW contracts called for payment of 40 cents per ton to the UMW welfare fund.
 
 
 16
 In January 1961, a judgment against Quality in excess of $84,000, representing defaults in such welfare fund payments,[12] remained unsatisfied. An engineering firm which had recommended to Kumpf that a larger drag line be installed to increase production and to effect a profitable operation of the mine brought the situation to the attention of John Wade Bell, Jr. and C. F. Cunningham, officers of Lafayette Spring Coal Company of West Virginia, who were interested in additional coal mining investments, and indicated to them that Quality and Brazil could not pay for such an installation. Bell started negotiations with Kumpf to acquire the strip mine and by March 18, 1961, the properties had been appraised, abstracts of title furnished, and agreement reached as to the amounts to be paid for shares of stock in a new corporation. On that date, Center Point was incorporated for the purpose of purchasing and operating the strip mine. Lafayette Spring Coal Company acquired two-thirds of the 1,500 shares of its capital stock. The new corporation purchased a substantial portion of Brazil's assets, including leases, real property, office building, and machine shop in April 1961, and additional equipment and supplies in June. In addition to the equipment acquired from Brazil, Center Point leased the larger drag line as recommended. The assembly of the drag line started about June 5 and it was put into operation about September 5. Center Point continued to use the exclusive sales agent of Quality and Brazil, the Chicago firm of Bell and Zoller, and before starting its own stripping operations on September 5, purchased, prepared and delivered to Bell and Zoller coal for out-of-state shipment valued in excess of $5,000. During the first two weeks of stripping operations Center Point sold coal mined by it to Bell and Zoller, priced at $20,000, some of which was shipped out of Indiana. The interstate shipments resulting from the business of Quality and Brazil had clearly come up to the Board's jurisdictional standards.
 
 
 17
 Kumpf continued to manage the mine for Center Point. While he was no longer the controlling stockholder, and now consulted with other members of the board of directors on policy matters, he did handle labor relations and conduct the day to day operation of the mine.
 
 
 18
 Kumpf had expressed a desire to operate the mine on a non-union basis and this was known among the former employees of Quality. Four or five of these employees suggested to him that he get information concerning the welfare plan of Progressive. On or about March 15, 1961, he made a trip to Harrisburg, Illinois, where he secured such information from a coal company operator, a Progressive representative, and a Progressive miner. He advised Bell and Cunningham of what he had learned, and on April 15, he and these two officers of Center Point again went to Harrisburg to find out 'whether the Company would like this sort of an arrangement', and an officer of Progressive gave them the same information Kumpf had obtained concerning the Progressive welfare fund benefits, the fund's administration, and the amount paid in by the companies. Kumpf later explained the difference between the UMW contract and a Progressive contract as 'in UMW welfare and retirement plan you paid 40 cents a ton royalty, in Progressive you paid 20 cents a ton'.
 
 
 19
 On May 24, 1961, Kumpf met with officials of Progressive at Springfield, Illinois, where he received a supply of Progressive authorization cards and came to a tentative agreement on the terms of collective bargaining contracts to cover the employees of Center Point strip mine which included provision for the payment of 20 cents per ton to the Progressive welfare fund. Arrangements were tentatively made by Kimpf for a meeting with representatives of Progressive at Marshall, Illinois, on June 3, 1961.
 
 
 20
 Kumpf had promised some of the employees whose services were being terminated by Quality employment with Center Point. On June 2, Kumpf received drafts of the tentative agreements he had reached with Progressive on May 24, and on that evening presided at a meeting he arranged with 12 of the employees who had been terminated by Quality and 2 truck drivers of another company, who were on Quality's payroll when they did trucking at the mine. He spent about one and one-half hours explaining the information he had obtained about Progressive and going over the contents of a letter from Progressive's president explaining its organization and its welfare and retirement fund. He laid the authorization cards on the table and told the group what they were. There was credited testimony that Kumpf further told the group that he could not work under a UMW contract; that he had been in contact with Progressive and that 'that is the way we wish to go into business, affiliated with them, and if there is anyone that doesn't wish to belong to that organization, they can walk out right now * * *'. He then left the meeting together with the two truck drivers. When Kumpf returned, about 45 minutes later, he was told that the 12 employees had signed Progressive authorization cards, were interested, but wished to meet with Progressive. Kumpf replied that tentative arrangements had been made for such a meeting, telephoned the president of Progressive, and confirmed the meeting for the following day. Arthur Kumpf, one of two spokesmen selected by the group retained possession of the signed authorization cards. Arthur Kumpf is a brother of Carl F. Kumpf. He was the relief drag line operator and mechanic for Quality and was paid a monthly guaranteed salary computed on the basis of a drag line operator's rate. He gave such directions to the truck drivers and others as the operation of the drag line required. If a man became ill he would give him permission to go home and would operate for him. Center Point employed him as a drag line operator.
 
 
 21
 On June 3, 1961, the 12 men who had attended the meeting went to Marshall, Illinois, by automobile. Kumpf furnished and drove one of the cars. They went to a motel room where Kumpf introduced the men to several representatives of Progressive and then left. The officials of Progressive read their standard labor contract to the men and discussed its welfare provisions, and the employees then voted to have Progressive as their bargaining agent. Arthur Kumpf then delivered the signed authorization cards to Progressive which thereupon immediately chartered a new union local (No. 403). Arthur Kumpf was elected president of the local and Progressive appointed him the district officer and an International Board Member. Kumpf was called back into the room and the collective bargaining agreement with Progressive was executed, to be effective June 5, 1961.
 
 
 22
 Center Point started operations at the mine on June 5. On that date 5 of the men who had participated in the June 2 and 3 meetings started to work; three more on June 6, two on June 16; and, two on July 13. Fourteen other men, all except two of whom were also former employees of Quality, began working on various dates from June 6 to September 11. By September 11 (after resumption of stripping operations) Center Point had a complement of 26 employees at the mine, 22 of whom were former Quality employees. All were members of Progressive. The employees who had not attended the June 2 and 3 meetings signed membership application cards before they started work. Arthur Kumpf told one of these employees, William A. Thomas, two days before he reported for work that the mine 'was either going to work Progressive or it wasn't going to work at all'. As others reported for work or were notified to return they were contacted by Arthur Kumpf or another officer of Local No. 403 and their applications for membership taken.
 
 
 23
 On or about April 4, 1961, W. W. Killion, an International Board Member of UMW, had met with Kumpf concerning the reason for Quality's notice terminating the UMW bargaining agreement. Kumpf advised him that the company had lost money for a long time and that he could not continue to operate any longer. When Killion stated that he had heard Kumpf was buying a new drag line and asked as to the future plans, Kumpf replied that he had been 'working on a couple of things' which did not appear to be working out, and that the purchase of the new drag line was only one of a number of rumors. He stated he would have no objection to discussing a new agreement with UMW but 'would have to wait to see if he-- what he came up with'.
 
 
 24
 Upon Killion's request, Kumpf met with him and another UMW representative on June 7, in the presence of four representatives of Progressive. These included Woodruff, with whom Kumpf had consulted in Harrisburg, and Arthur Kumpf and John Gettle, of Local No. 403. Killion reminded Kumpf of the April 4th conversation, and Kumpf disclosed to UMW for the first time that a contract had been signed with Progressive and explained that the payment required to the welfare fund of Progressive was only half that which was required under the UMW contract. When Killion inquired if the employees who worked for Quality would be rehired, Kumpf replied that 'some would be, some would not be'. Kumpf stated that the decision wasn't up to him; that he had two partners. He refused to name them stating that it was none of Killion's business.
 
 
 25
 Other factors to be gleaned from the record are that the employees involved had long been union adherents-- they wanted union membership and the benefits of a welfare fund. On the other hand, their relationship with Kumpf had been close. When UMW had obtained an earlier $41,000 judgment against Quality for defaulted welfare fund payments the employees in 1957 loaned money to Brazil to purchase Quality's assets and help pay the judgment.
 
 
 26
 The contention that the operations of Center Point are not such that the Board should have asserted jurisdiction is without merit. The policy standards of the Board do not limit the jurisdiction conferred on it by Congress. N.L.R.B. v. Chauffeurs, Teamsters & Helpers, Etc., 7 Cir., 274 F.2d 19, 23-24. The $5,000 dollar volume of coal shipped interstate by Center Point prior to its commencement of stripping operations in and of itself is sufficient to avoid the rule of de minimus, (N.L.R.B. v. Aurora City Lines, Inc., 7 Cir., 299 F.2d 229, 231) apart from consideration of application of the broader doctrine of Polish Alliance of U.S. of North America v. N.L.R.B.,322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509. Moreover, the Board could reasonably conclude that the employment of the larger drag line would result in increased production and interstate shipments in excess of those made by Quality and Brazil which had clearly come up to the Board's jurisdictional standards.
 
 
 27
 The record clearly establishes that there was no change in any essential attribute of the employment relationship when the mining operation was sold by Brazil to Center Point, which had been organized for the express purpose of the transfer. The nature of the business remained the same, the same kind of coal was mined and sold in the same manner through the same sales agent. The mine manager remained the same and 22 of Center Point's 26 employees were the same. Thus, 'for all practical purposes there was continuity in the nature and functions of the same employing industry' and 'no marked change in personnel'. N.L.R.B. v. Auto Ventshade, Inc., 5 Cir., 276 F.2d 303; N.L.R.B. v. Armato, 7 Cir., 199 F.2d 800. The test here is not whether Center Point is a successor corporation to either Quality or Brazil but whether Center Point is a successor employer of the same work force in the same enterprise. The Board's finding and conclusion that it is finds ample support in the record and in law.
 
 
 28
 Consequently, absent a fair doubt-- one having a rational basis in fact-- as to UMW's status as the bargaining representative of the majority of the employees in the unit it was Center Point's duty to recognize and bargain with UMW. N.L.R.B. v. John S. Swift Company, 7 Cir., 302 F.2d 342. That 4 or 5 of the 36 employees in the unit had expressed an interest in Progressive was no basis for good faith doubt as to UMW's continued majority status. And this is especially so in view of the fact that such interest may well have been engendered or spurred by Kumpf's announced non-union inclinations. It was Center Point's duty to bargain with UMW and the Board was warranted in finding a refusal to so bargain in Kumpf's April 4 and June 7 conversations with Killion and Center Point's June 3 action in executing a bargaining agreement with Progressive.
 
 
 29
 The record substantially supports the Board's finding and conclusion that Center Point unlawfully assisted and supported Progressive. The April 15 meeting of Bell, Cunningham and Kumpf with an officer of Progressive at Harrisburg supports a conclusion that its purpose was not, as contended by Center Point, a trip by Kumpf as the agent of 5 of the employees to obtain information concerning employee benefits under the Progressive welfare plan-- information Kumpf had obtained a month earlier but which, in so far as the record shows, he apparently had not as yet relayed to his claimed employee principals and which is urged as justification for the later June 2 meeting with the 12 employees-- but was for the admitted purpose of finding out whether Center Point 'would like this sort of an arrangement'. When Bell and Cunningham verified the information Kumpf had earlier reported to them following his March 15 visit to Harrisburg, Kumpf proceeded to contact the president of Progressive and to negotiate a tentative collective bargaining agreement. It was only after this preparation, and on the evening of the third day before the mine resumed operations, that Kumpf held the June 2 meeting with the 12 former Quality employees. It was then over 2 1/2 months from the time he had secured the information with respect to which the 5 employees had expressed an interest. But on June 2 he was fulfilling the role of an advance agent for Progressive explaining its program to the 12 employees who were expecting to go to work for Center Point. The record does not justify a conclusion that Kumpf was merely expressing his opinion-- privileged by Section 8(c). Cf. N.L.R.B. v. Wagner Iron Works, 7 Cir., 220 F.2d 126, 138; Harrison Sheet Steel Co. v. N.L.R.B., 7 Cir., 194 F.2d 407, 410. And Center Point's reliance on cases such as Chicago Rawhide Mfg. Co. v. N.L.R.B., 7 Cir., 221 F.2d 165 is misplaced. Kumpf's activities constituted much more than laudable employer-employee cooperation. He assumed the lead in organizing the presentation to the employees of the case for Progressive affiliation. Their indoctrination was not left to Progressive. And, he already had a commitment for a collective bargaining agreement on the terms he had negotiated. Center Point's argument that Kumpf was acting merely for the employees and at their request carries no conviction. The Board was not in error in finding and concluding that Center Point unlawfully assisted and supported Progressive. Apart from Center Point's duty toward UMW it at least had the obligation of strict neutrality. St. Louis Independent Packing Co. v. N.L.R.B., 7 Cir., 291 F.2d 700.
 
 
 30
 No proof of coercive intent or result is necessary to establish an unfair labor practice on the part of an employer. Time-O-Matic, Inc. v. N.L.R.B., 7 Cir., 264 F.2d 96. But when the remedy fashioned must find justification in the existence of coercion we are of the opinion that a finding of coercion must rest on more than unsupported inference. Perry Coal Company v. N.L.R.B., 7 Cir., 284 F.2d 910, 915, 916. And from a consideration of the record as a whole we are of the view that it does not substantially support a finding or conclusion that the employees of Center Point were coerced into membership in Progressive or into the payment of dues or assessements thereto. Center Point's assistance and support of Progressive and Kumpf's statement at the June 2 meeting did not, as we view the record, have such coercive effect. The employees, although they executed authorization cards, retained control of the cards, and decided to determine their course of action only after a meeting of their own with representatives of Progressive. It was after such meeting that they elected to affiliate with Progressive. These employees were union men acting in concert-- there is nothing to indicate that they were unaware of their rights. And, a choice, to be free, need not be made in a vacuum.
 
 
 31
 The Board's finding of coercion appears to rest largely on its finding that Center Point maintained a hiring practice requiring membership in Progressive as a condition of employment. But the record does not support such finding. It is based on the activities and statements of Arthur Kumpf. But there is nothing to support the Board's conclusion that his solicitations of union membership or statements are attributable to Center Point. Whatever Arthur Kumpf's status with Quality may have been the record is barren of support that his employment with Center Point was in a supervisory capacity. It is merely shown that Center Point employed him as a drag line operator.
 
 
 32
 We conclude that the record considered as a whole does not support findings or conclusions that Center Point conditioned employment on membership in Progressive or that the employees' membership in Progressive and the payment of dues and assessments were the result of coercion. The rationale of Local 60, Carpenters v. N.L.R.B., 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1, and Perry Coal Company v. N.L.R.B., 7 Cir., 284 F.2d 910, is applicable here. Under the circumstances the Board's direction that dues and assessments be refunded is neither authorized nor proper. And we do not reach the question of the Board's authority to order that such refunds, where proper, be made with interest.
 
 
 33
 It has been approximately two years since the employees involved affiliated with Progressive and established Local 403. None of the employees of Center Point nor any former employee of Quality is a charging party or complainant in these proceedings. No employee has complained of any coercion. The primary objective of Congress in enacting the National Labor Relations Act was to achieve stability of labor relations. Colgate-Palmolive-Peet Co. v. N.L.R.B., 338 U.S. 355, 362, 70 S.Ct. 166, 94 L.Ed. 161. And, in Brooks v. N.L.R.B., 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125, it was pointed out that 'the underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it.' We are of the opinion that it would be equally disruptive of a peaceful status quo to here enforce the Board's order that Center Point be now required to bargain with UMW, the charging party. The situation is similar to that which was presented in Perry Coal Company v. N.L.R.B., 7 Cir., 284 F.2d 910 and291 F.2d 126, where we held that there need be no bargaining with any union until after a Board-conducted election. The interest of industrial peace, a cardinal purpose of the Act, as well as its spirit and intent, here require only that the employees involved be permitted to express their existing choice concerning collective bargaining representation in an atmosphere free from employer assistance to any union.
 
 
 34
 The Board's order will be modified by deleting those provisions requiring Center Point to bargain with UMW; requiring the reimbursement of the employees for dues and assessments, together with interest; and by inserting a provision requiring a Board-conducted election. As so modified the order will be enforced.
 
 
 35
 Enforcement of order as modified ordered.
 
 
 
 [1]
 Referred to herein as Progressive
 
 
 [2]
 Referred to herein as Center Point
 
 
 [3]
 All references herein to the 'Act' are to the National Labor Relations Act, as amended. 29 U.S.C.A. 151 et seq
 
 
 [4]
 The Board's Decision and Order are reported at 139 NLRB No. 6
 
 
 [5]
 Referred to herein as MUW
 
 
 [6]
 The Board's findings, conclusions and order also embrace Carl F. Kumpf, Brazil Block Coal and Clay Co., Inc., and Quality Coal Corporation but these parties did not petition for review of the order nor appear in opposition to the Board's petition for enforcement of the order as it applies to them
 
 
 [7]
 29 U.S.C.A. 158(b)(1)(A) which provides: 'It shall be an unfair labor practice for a labor organization or its agents-- (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: * * *'
 
 
 [8]
 29 U.S.C.A. 158(a)(1), (2), (3) and (5) which provide:
 'It shall be an unfair labor practice for an employer--
 '(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * * (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title * * *'
 The rights guaranteed to employees by Section 7 (29 U.S.C.A. 157) are: 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.'
 
 
 [9]
 Board Member Brown found no justification for the finding that Progressive restrained and coerced employees by receipt of union fees and dues
 
 
 [10]
 Hereinafter referred to as 'Kumpf'. His brother is referred to as Arthur Kumpf
 
 
 [11]
 A. E. Geisey, who had owned the other one-half of the shares sold them to Brazil in 1961
 
 
 [12]
 That judgment had been affirmed by this Court in Lewis v. Quality Coal Corporation, 7 Cir., 270 F.2d 140