GRAVES TRUCKING, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 79–2467.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1980.

Decided Nov. 1, 1982.

John C. Theisen, Gallucci, Hopkins & Theisen, Fort Wayne, Ind., for petitioner.

Richard Michael Fischl, Elliott Moore, Attys., N.L.R.B., Washington, D.C., for respondent.

Before CUDAHY, Circuit Judge, FAIR-CHILD, Senior Circuit Judge, and TEMP-LAR,* Senior District Judge.

FAIRCHILD, Senior Circuit Judge.

Graves Trucking, Inc., the employer, petitioned for review, to have us set aside or modify an order of the NLRB.[1] The Board seeks enforcement.

In general outline, Graves Trucking's employee Hanes (found by the Board to be a supervisor) assaulted Graves Trucking's employee and union steward Nash. Nash had

* Senior District Judge George Templar of the District of Kansas sitting by designation.

led other employees in concerted action to protest a change in conditions of employment. The Board found a § 8(a)(1) unfair labor practice. The ALJ found that Nash has "been under a doctor's care for injuries stemming from the choking incident, and has remained under medical orders not to return to work." As part of the remedy, the Board ordered Graves Trucking to make Nash whole for loss of earnings suffered as a result of the unlawful conduct until his injury no longer precludes him from performing his former or a substantially equivalent job, plus interest.

The details are set forth in the decision of the ALJ, 246 N.L.R.B. at 346–48. Graves Trucking challenges the finding that Hanes was a supervisor, the finding that Graves Trucking was responsible for physical injury to Nash, and the propriety of the Board's lost earnings (backpay) remedy.

*I. The Finding that Hanes Was a Supervisor*

■ Graves Trucking is engaged in the business of transporting construction materials. Its home office is at Fort Wayne, Indiana. In the summer of 1978 Graves Trucking contracted to haul asphalt from a plant about 60 miles from Fort Wayne to highway construction sites on Interstate Highway 69.

Nash and one other driver began working on the project May 31. Hanes and four other drivers arrived June 6. All, including Hanes, performed similar driving duties at the same rate of pay. All were union members, although not of the same local.

Hanes, however, clearly had been given additional responsibilities and some degree of authority over the other drivers. There was testimony that on June 6, when Hanes first came on the job, he introduced himself as "the boss of the job." Schuhler, a co-owner of Graves Trucking, told one of the drivers that day that Hanes was the man who would run the job. Hanes arrived in a Company truck, and was the only driver

1. Reported at 246 N.L.R.B. 344 (1979).

who drove a Company truck to the job site. The drivers turned in their time and weight tickets to him. If incomplete, he would give them back for completion, although his only further responsibility was to convey them to the home office. He handed out the paychecks, and accepted grievances, although he simply transmitted them to the home office. He delivered warning letters when issued by the home office. He assigned particular hauling jobs, specified the drivers' starting schedule, and assigned overtime work. There was testimony that on one occasion Hanes gave permission to a driver to take an afternoon off, provided he got a driver to work in his place, and that in another conversation, he said that a driver who ran light loads "would have to be wrote up if it didn't straighten out."

Hanes testified it was part of his responsibility to see that the employees started on time. The normal paid workday started at 5:45 AM, the first fifteen minutes being devoted to safety inspection of the trucks. On June 20, Hanes told drivers Moore and Kissell that they were to have their trucks ready at 6:00, but would no longer be paid for the inspection period. The drivers informed Nash, the union steward, and on June 21, they all arrived at 6:00 rather than 5:45. Hanes said he wanted them there at 5:45, but they wouldn't be getting paid for the fifteen minutes. Hanes told Nash, "I'm telling you right now if you guys ain't going to do your job you are going to get fired."

The incident in which Hanes choked Nash occurred soon thereafter, as described in the ALJ's findings. In discussing the assault with Hicks, the union business agent, Hanes "said he wanted the people on the scales at 6:00 o'clock." After admitting the assault, he said, "I flew off the handle." When Hicks called Mr. Graves to remonstrate about the "supervisor" choking the union steward, Graves "said Dick Hanes was going to run that god damned job down there, that Bill Nash was not going to run it." Later Hicks talked with Schuhler at the job site and objected to having the men work under Hanes' jurisdiction. Hicks testified: "He said we would work under

them. If we didn't work under them Hanes had the authority to fire whoever refused to work for him." Earlier, before the job started, Mr. Graves had told Hicks "Dick Hanes would be the man running the job and he was the man we would be getting hold of on the job site." Section 2(11) of the National Labor Relations Act defines the term "supervisor":

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). It is well settled that possession of any of the above indicia is sufficient to support a finding that an employee is a "supervisor" within the meaning of the act. *N.L.R.B. v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir. 1977); see also *N.L.R.B. v. Brown Specialty Co.*, 436 F.2d 372, 375 (7th Cir. 1971).

The Board is entitled to a "large measure of informed discretion" in determining whether an individual is a "supervisor" within the meaning of the Act. *N.L.R.B. v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 726 (7th Cir. 1977); *Dynamic Machine Co. v. N.L.R.B.*, 552 F.2d 1195, 1201 (7th Cir. 1977), cert. denied, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed. 2d 85 (1977). We have no difficulty determining that there is adequate support for the finding in this case.

## II. The Employer's Responsibility for Hanes' Conduct

Graves Trucking contends that even if Hanes was a supervisor, the Board could not properly hold it responsible for his conduct, including any personal injury the conduct may have caused.

Leaving aside the violent aspect of his conduct, it seems quite clear that the Board

could find, by reason of Hanes' actions, that Graves Trucking had engaged in a § 8(a)(1) unfair labor practice. Hanes was properly found to be authorized to direct the drivers concerning their prompt reporting for work. A dispute developed over his telling them they would cease to be paid for the time spent in truck inspection. Their arrival at 6:00 after consultation with the union steward was, under the circumstances, concerted action concerning the change in pay and schedule. Hanes' resulting threats and verbal abuse, if there had been nothing more, could properly have been deemed coercion, restraint, and interference in the exercise of protected rights. As it actually happened, the threats and verbal abuse culminated in a violent assault on employee and union steward Nash, even more coercive conduct.

Graves correctly points out that, aside from the Hanes-Nash June 21 incident, there is no evidence of anti-union animus on the part of Graves Trucking, and that the violence of Hanes' conduct may have been sparked by his own anger over an otherwise unrelated misfortune of his own, an accident he had just had in maneuvering his truck.

Graves Trucking relies principally on *National Labor Rel. Bd. v. Miami Coca-Cola Bottling Co.*, 222 F.2d 341 (5th Cir. 1955). There the court set aside a Board finding of a § 8(a)(1) unfair labor practice based on a supervisor's assault on two union officials who were distributing literature outside the plant. In terms of agency doctrine, one might argue that going outside the plant to accost union officials was beyond the scope of the Miami supervisor's employment. In contrast, an altercation with several employees at the worksite concerning the employees' compliance with the prescribed work schedule seems well within the scope of Hanes' employment.

In any event, the Fifth Circuit relied upon strong, prompt, and widely disseminated repudiation by the employer of the supervisor's conduct in determining that employees could not reasonably consider themselves interfered with, restrained, or coerced.

There is positive testimony of Mrs. Buckner [Employer] and others that such conduct was not allowed; that Mrs. Buckner severely reprimanded Monk [the supervisor] immediately and laid him off for a week without pay; that a notice to all employees was immediately posted, informing them that Monk's act was without authority and on his own volition in violation of specific instructions and that disciplinary action was being taken.

222 F.2d at 346.

After pointing out that the controlling consideration in this context is *"whether employees have been subjected to prohibited compulsions flowing from the employer's economic power which the employer could and should have prevented the use of,"* the court said,

> The testimony concerning the altercation indicated that it was a spontaneous affair arising out of a personal argument between Monk and the union representatives. In view of the fact that Monk was immediately disciplined and the notice previously summarized was posted, we are unable to find substantial evidence of the prohibited compulsion. While some employees might be quick to interpret Monk's act as a company-engendered effort to discourage their organization, we think such a belief would be unreasonable under the circumstances revealed by this record.

*Id.* (Emphasis in original.)

Not only did the Hanes-Nash incident pertain to matters within the responsibilities Graves Trucking had conferred on Hanes, but we conclude that Graves Trucking's single expression of disapproval after the fact did not suffice as a repudiation.

Hicks, the union business agent, complained about the choking incident to Mr. Graves the morning of the occurrence. Graves asked Hicks if the drivers had told Hicks they came in late. It was after that that Graves asserted that Hanes, not Nash, was going to run the job. Graves did send Schuhler to the job site, and the dispute about the drivers being paid for inspection time was resolved in favor of the drivers.

There was testimony of a conversation when Schuhler, Hicks, and Nash were present (and perhaps Hanes and one other). Schuhler said, "I want you to know Hanes was at fault." Hicks said, "Well, I want him out of here." Schuhler said, "No, he's going to stay on the job. He is going to run the job." A moment later Schuhler said, "If he gives orders and they are not obeyed, somebody is going to get fired."

■ It has been recognized that in the absence of a specific repudiation by the employer of the conduct of its supervisors, the employer is responsible for the acts of the supervisors. *Altman Camera Co., Inc. v. N.L.R.B.*, 511 F.2d 319, 321 (7th Cir. 1975).

■ The acknowledgement by Schuhler that Hanes was "at fault" was not made known to all the employees affected, and in any event was accompanied and followed by reiteration of Hanes' authority. It fell short as a repudiation.

### III. The Remedy

Assuming (or apparently finding) that Hanes' assault had caused disability which continued until the date of hearing, January 9, 1979, and might continue thereafter, the Board chose a remedy which would require Graves Trucking to make Nash whole for lost earnings.

The Board explained that its award is "a necessary remedy to vindicate the purposes of the Act. The only way to restore Nash as nearly as possible to the economic position he would have obtained, but for Respondent's unlawful conduct, is to make him whole for compensation lost as a result of Respondent's unfair labor practice."

The Board ordered, accordingly, that Graves Trucking, Inc. shall

Make William Nash whole for any loss of earnings he may have suffered, or will suffer, as a result of Respondent's unlawful conduct against him until a reasonable period after his injury resulting from said unlawful conduct no longer precludes him from performing his former or a substantially equivalent job with Respondent, or any other employer, plus interest.

Graves Trucking makes three arguments in challenging the remedy:

(1) It goes into matters beyond the power, expertise, and competence of the Board, Nash's proper remedies being either a common law tort claim or a workmen's compensation claim, or both.

(2) It is an attempt by the Board to achieve ends other than effectuating the purpose of the Act.

(3) In any event, because of the completion of the I-69 job on November 4, 1978, Nash would in no event have continued employment with Graves beyond that date, and to extend the make-whole remedy beyond that date "is clearly punitive in nature and impermissible."

In support of argument (1), Graves Trucking sets forth the policy of the Board in denying a similar remedy to employees injured by tortious conduct, assaults or violence by union agents, and argues that there is no rational basis which would justify different treatment of employer and union liability in assault cases.

[4] Section 10(c) of the Act grants the Board the authority to order a violator of the Act "to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without backpay, as will effectuate the policies of this subchapter. . . ." 29 U.S.C. § 160(c). The remedial power of the Board is "a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed. 2d 233, 241 (1964). Thus, the Board's choice of remedies will not be disturbed on review in the absence of an abuse of discretion, *Kesner v. National Labor Relations Bd.*, 532 F.2d 1169, 1175 (7th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed. 2d 593 and 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed. 2d 623 (1976), or "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. Rutter-Rex Mfg. Co.*,

396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405, 410 (1969) (quoting *NLRB v. Seven Up Bottling Co.,* 344 U.S. 344, 346–47, 73 S.Ct. 287, 289, 97 L.Ed. 2d 377, 381 (1953)).

The backpay order has long been used to effectuate the purposes of the Act, and in general its legitimacy is unquestioned. *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309, 317–18 (1956). Traditionally, backpay orders appear in situations where the unfair labor practices committed related directly and exclusively to a matter of job status.[2]

In the traditional setting the purpose of the backpay award is to restore " 'the economic status quo that would have obtained but for the company's wrongful refusal to reinstate.' "[3] *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 188, 94 S.Ct. 414, 427, 38 L.Ed. 2d 388, 405 (1973) (quoting *NLRB v. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed. 2d 405, 411 (1969)). "A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice." *Nathanson v. Labor Board,* 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952). From the perspective of the wronged individual, the award mitigates the inhibiting effect of the unfair labor practice on exercise of protected rights. Further, the fact of the award must demonstrate to other employees that the law will protect such exercise.

■ We see these factors operating here, although the loss of earnings was caused by the unfair labor practice in a somewhat different manner as compared with discriminatory discharge and the like.

We have no hesitancy in concluding that although the make-whole remedy in this situation presents considerations not always present, it does tend to effectuate the policies of the Act, and is not punitive in nature.

The remedy does, in these circumstances, overlap the injured party's tort remedy, to the extent of lost earnings, but provides no recovery of other categories of damages which might amount to a significant part of any recovery in a tort action.[4]

We do not view the existence of this overlap as a compelling reason for rejecting the Board's remedy.

The Board, however, has at times deferred to a tort remedy because of the presence in this type of case of issues which are commonly decided in tort litigation, but rarely come before the Board. In implementing the remedy it will be necessary to determine whether Nash continued in fact to be disabled, whether his continuing disability was caused by Hanes' conduct, and the extent and duration of such disability.

Graves Trucking points to the Board's own long-standing refusal to award employees backpay during disability suffered as a result of assaults by union agents as a reason why the Board should refrain from providing the remedy ordered here. Initially, the Board's policy was premised on the view that Section 10(c) of the Act was insufficient statutory authority for such an award. *United Furniture Workers (Colonial Hardwood Flooring Company, Inc.),* 84 N.L.R.B. 563, 565 (1949). In 1963, the Board apparently reconsidered the scope of its remedial powers and moved toward re-

---

**2.** For example, the order is frequently awarded in cases involving discriminatory discharge, discriminatory demotion, and wrongful refusals to reinstate employees. R. Gorman, *Basic Text on Labor Law,* 138–39, 287, 533–34 (1976).

**3.** The Supreme Court has held that a backpay order may be appropriate without reinstatement. *Radio Officers v. Labor Board,* 347 U.S. 17, 54, 74 S.Ct. 323, 343, 98 L.Ed. 455, 484 (1954).

**4.** Everyone has assumed that Nash can pursue an action for personal injury against Hanes. The parties have not discussed, and we make no effort to declare, whether, under the law of Indiana, an employee has a cause of action against his employer in these circumstances. The Board's decision provided that to the extent Nash's workmen's compensation award replaced lost wages, it shall be deducted from backpay. The brief filed in the Board's behalf asserts additionally that any loss of earnings recovery in a tort action will likewise be deducted.

jecting this view. *International Union of Operating Engineers, Local 513 (Long Construction Company),* 145 N.L.R.B. 554, 555 (1963). The Board, however, retained the policy, justifying it in part as follows:

[T]o the extent that the Board has power to award backpay to employees injured by Respondent's violent conduct, such power derives from the effect of such conduct on the employee's employment relationship; yet the employee's loss of pay may be only a small part of the total required to make him whole, which total may include medical expenses as well as compensation for physical injury and pain and suffering.... [T]he numerous and complicated factual questions involved in settling such claims are not such questions as fall within the Board's special expertise, but do fall within the special competence of judge and jury.

*Id.* at 566. In 1973, the Board again affirmed its policy, but relied principally on avoidance of "the risk of inhibiting the right of employees to strike to such an extent as to substantially diminish that right." *Union de Tranquistas, Local 901 (Lock Joint Pipe & Co.),* 202 N.L.R.B. 399 (1973). In a footnote, the Board referred to that part of the *Long* rationale which suggested that an employee's loss of pay may be only a small part of the total required to make him whole.

Again, in *Union Nacional de Trabajadores,* 219 N.L.R.B. 414 (1975), the Board applied its policy in a picket line violence case, and after referring to *Lock Joint Pipe,* commented that "Use of [traditional] remedies would bring these employees before tribunals which have more expertise and are better equipped than this Board to measure the impact of tortious conduct, including violence, and to make the victims whole for loss of pay and any other injury." Thus it appears that in the union situation the Board continues to rely on its preference for a tort remedy as one part of its rationale, but in combination with a policy factor pertaining to unions though not to employers.

Graves Trucking appears to contend that the Board is bound by something in the nature of an admission that it lacks special competence and expertise in matters involving personal injury where tort remedies are available, and must thus forego a loss of earnings remedy here.

Counsel for the Board has cited a number of instances where the Board has ordered an employer to pay backpay for relatively short periods of disability where the injury or illness was attributable to an unfair labor practice. *Moss Planing Mill Co.,* 103 N.L.R.B. 414 *enforcing National Labor Relations Bd. v. Moss Planing Mill Co.,* 206 F.2d 557 (4th Cir. 1953). *See also National Labor Rel. Board v. Moss Planing Mill Co.,* 224 F.2d 702 (4th Cir. 1955); *National Labor Relations Bd. v. Moss Planing Mill Co.,* 256 F.2d 653 (4th Cir. 1958); *Charles T. Reynolds, Sr.,* 155 N.L.R.B. 384, 386 n.1 (1965), *enforcing N.L.R.B. v. Reynolds,* 399 F.2d 668 (6th Cir. 1968); *American manufacturing Co.,* 167 N.L.R.B. 520, 522–23 (1967); *M.F.A. Milling Co.,* 170 N.L.R.B. 1079, 1079–80 (1968), *enforcing Local Union 676, AFL–CIO v. N.L.R.B.,* 463 F.2d 953 (D.C.Cir.1972); *Becton-Dickinson Co.,* 189 N.L.R.B. 787 (1971). The periods involved ranged from one month in *American Manufacturing Co.* to eleven months in *Charles T. Reynolds, Sr.* Although we have cited the court decisions enforcing these orders, the opinions did not discuss the fact that the backpay remedies covered periods of disability attributed to unfair labor practices. Presumably the issue was not raised.

No case has been brought to our attention where the Board awarded backpay, as here, for as long in the future as the disability would continue. An open-ended award of that type goes about as far as possible in supplanting the loss of earnings portion of a tort recovery. More significantly, we think, it contemplates determination from time to time in compliance hearings of questions of the continued existence of disability and its cause and extent. Such questions may well be difficult and are outside the scope of those usually dealt with by the Board. The open-ended character of

the remedy exacerbates all the problems of limited expertise to which the Board has referred in the union violence decisions.

We are not persuaded that the Board's policy in matters of violence by agents of unions forecloses the Board as a matter of law from the type of remedy employed here. We are satisfied, however, by the Board's acknowledgments of its own limitations in this area that the award of an open-ended remedy, as here, is an abuse of discretion.

Having so decided, we have considered what must be the outer limit of the backpay award.

Graves Trucking argues, alternatively to its opposition to any backpay award, that the limit should be November 4, 1978. That was the date of completion of the particular job. This job was outside of Graves Trucking's home area, and Nash belonged to and was referred by a union local having jurisdiction over the job site. Hence it was improbable that Nash would have had further opportunity to work for Graves Trucking. This date might well be the proper termination of backpay awarded in the more traditional situations, but it had no relevance to the duration of Nash's disability.

Other possible limiting dates might be January 9, 1979, the date of the ALJ's decision, or November 2, 1979, the date of the Board decision. These, too, are somewhat fortuitous.

We have considered the cases cited here where the Board has decided to attribute various types of disability to the unfair labor practice at issue, and to require backpay for that period. The longest cited was eleven months. We are mindful of the limitations on our function as a reviewing court, but have selected two years as the outer limits of a backpay award in this case. A two-year period would provide a substantial remedy even if Nash's disability lasted longer, but it would minimize the need of the Board continually to make the type of determinations which are intrinsic in the implementation of this remedy.

## IV. The Finding of Continued Disability

The ALJ found:

> Nash reported for work on June 22, the day following the injury, but was forced to leave at 10 a.m. because the pain in his throat and head had become too severe. He has since been under a doctor's care for injuries stemming from the choking incident, and has remained under medical orders not to return to work.

The Board decision went further and used more positive terms. It appears to have found that "Respondent's unlawful conduct ... rendered, and continues to render, Nash medically unfit to perform his former, or a substantially equivalent, job for any employer." Graves Trucking objects to at least the Board's finding contending that it justifiably did not present evidence on the issue of the neck injury and its nature and extent.

As we read the record there was adequate support for a finding that Hanes choked Nash quite violently, that Nash finished work that day, but left the next morning to see a doctor on account of continuing pain, and that the doctor advised him not to go back to work until released. There was no medical testimony at the hearing. A neurologist's report, dated August 15, 1978, is in the record, but is somewhat equivocal as to the cause of problems observed, and would not, without more, support a finding that disability caused by the assault continued to the date of the report. There is surely enough to show that Mr. Nash believed he was and continued to be unable to work as a result of the assault, and that there was at least probable cause for the remedy the Board ordered. To the extent that the finding went beyond those propositions, they are set aside. These issues will have to be considered and definitive findings made at a compliance hearing, if the parties are unable to agree.

The petition for review is DENIED, except for the modification we make. Paragraph 2(a) of the Board order is modified so as to limit it to June 21, 1980 at the latest. As so modified, the order is ENFORCED. The parties will bear their own costs in this court.