NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TRANSPORT SERVICE COMPANY,
Respondent.

No. 91–2049.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1992.

Decided Aug. 26, 1992.

Robert J. Englehart (argued), N.L.R.B., Contempt Litigation Branch, Washington, D.C., Elizabeth Kinney, N.L.R.B., Region 13, Chicago, Ill., Aileen A. Armstrong, Collis Suzanne Stocking, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

Leonard R. Kofkin (argued), Fagel & Haber, Chicago, Ill., for respondent.

Before FLAUM, and MANION, Circuit Judges, and CURRAN, District Judge.*

MANION, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order remedying Transport Service Company's ("Transport") violations of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("Act"). The NLRB found that Transport violated 29 U.S.C. §§ 158(a)(5) and (1) ("sections 8(a)(5) and (1)") by unilaterally ceasing to make contributions to the charging Union's [1] pen-

sion and welfare fund on behalf of certain unit employees who worked before and during a strike; by failing and refusing to furnish relevant information requested by the Union during collective-bargaining; and by withdrawing recognition from the Union as the employees' collective bargaining representative. The Board also found that Transport violated 29 U.S.C. §§ 158(a)(3) and (1) ("sections 8(a)(3) and (1)") by failing to reinstate certain former striking employees in a timely manner. As explained below, we grant in part and deny in part the NLRB's application for enforcement of its order.

## I. Background

Transport is an Illinois corporation that transports bulk commodities for major chemical and food-grade shippers throughout the continental United States. Transport operates from ten terminals in eight states, but only one of its two Chicago, Illinois, facilities figures in the events leading to the NLRB's decision. The Union has been the exclusive collective bargaining representative of the employees at the Chicago terminal since 1946.

The last collective bargaining agreement between the Union and Transport expired October 31, 1985. Negotiations for a new agreement began in the fall of 1985 but were unsuccessful, and the employees continued to work under the terms of the expired agreement. After further unsuccessful bargaining sessions, Transport's chief negotiator, Robert Schurer, extended Transport's final offer in a letter to Edward Wojtczak, the Union's chief negotiator, dated March 21, 1986. The Union rejected the offer. No negotiations took place for six months, but Transport and the Union continued to observe the terms of the expired collective bargaining agreement.

On September 26, 1986, Schurer notified the Union that the terms of the March 21 offer would be implemented as of Septem-

---

* Hon. Thomas J. Curran, District Judge for the Eastern District of Wisconsin, is sitting by designation.

1. The original charges were filed by Automotive Mechanics' Local No. 701, International Association of Machinists and Aerospace Workers, AFL–CIO, referred to herein as "the Union."

ber 28. In response, Wojtczak initiated another round of proposals and counterproposals with Schurer. Finally, in December 1986, Schurer announced that Transport would reinstate the terms of the March 21, 1986 offer. The Union has not alleged that Transport bargained in bad faith.

On January 4, 1987, the unit employees began an economic strike and established a picket line. At the time of the strike, the unit included 13 employees: eight mechanics, one utilityman and four washers.[2] One of the four washers had suffered a pre-strike injury and was out of work on total disability. Three of the pre-strike employees continued to work during the strike: one utilityman and two mechanics. That left nine unit positions unfilled as a result of the strike: six mechanics and three washers.

On January 5, 1987, Transport notified the strikers that it would begin the process of permanently replacing them if they did not return to work immediately. Transport began interviewing permanent replacements shortly thereafter and hired three mechanics, three washers and an additional utilityman to supplement the utilityman who had worked during the strike. That left Transport with only three mechanics less than it had at the beginning of the strike.

The strike ended on January 13, 1987. By this time, all of the permanent replacements had been hired, although not all of them had started working.

On January 13, 1987, Wojtczak notified Schurer by telephone that the strike was over. Schurer explained that Transport had hired some permanent replacements but that Schurer, whose office was not in Chicago, did not know how many. Schurer agreed to meet Wojtczak on Thursday, January 15. Wojtczak subsequently sent Schurer a telegram reiterating that all employees would return to work unconditionally and warning that Schurer should reconsider his position that all employees would not be reinstated. Schurer responded with a telegram stating:

No refusal to reinstate was stated or implied. Issue is only number of employees required due to extent of permanent replacements and method of reinstatement to accommodate permanent replacements. All tank washers have been replaced but *three mechanics have not. Please select three mechanics to report to work immediately* at commencement of regular shift. Your version of our conversation in which you expressed no real understanding of the permanent replacement issue is incorrect and contrary to fact. I confirm meeting with you at 9:00 a.m. Thursday, January 15, 1987 at your office.

(emphasis added). The next day, Schurer sent a second telegram which stated:

In my haste to accommodate your unexpected offer late yesterday to return all strikers and to respond to your allegations, I misstated the substantial number of permanent replacements and the availability of work in view of the limited amount of equipment at the terminal during the strike. I will collect all information for review and discussion at tomorrow's meeting.

The parties met as agreed. At the meeting, Transport told the Union that only one mechanic's position in building maintenance was available to a returning striker. Transport recommended striking mechanic Danhoff should fill the position because although he was less senior than other striking mechanics he held the job prior to the strike. The Union agreed that Danhoff could take the position.

On February 17, 1987, Transport and Union representatives met again. At the meeting, the parties discussed contract proposals. Furthermore, Transport informed the Union that the permanent replacements were still employed and that the unreinstated striking employees were on a preferential hiring list. Finally, Transport agreed to provide the names, addresses and phone numbers of permanent replacements

---

**2.** The bargaining unit also included a shop foreman's position which was open at the time of the strike and remained open until about three months after the strike ended.

as well as information regarding Transport's pension plan proposal.

In mid-March, the Union had not yet received the requested information and telephoned Transport's attorney. On April 20, 1987, Transport notified the NLRB's regional office that Transport did not believe that the Union represented a majority of its employees in an appropriate unit and thus Transport had no obligation to provide the information that the Union sought.

The ALJ determined that Transport violated the Act in three respects. First, in violation of sections 8(a)(5) and (1), Transport failed to make payments to the Union's Health and Welfare Fund or the Union's Pension Fund on behalf of three strikers (McCormack, O'Connor and Taylor) who were hired after the collective bargaining agreement expired but before the strike and who continued to work during the strike. Second, in violation of sections 8(a)(3) and (1), Transport failed to reinstate three returning strikers (Anderson, McClain and Golden) and to timely recall two returning strikers (Carter and DeMoss). Third, in violation of sections 8(a)(5) and (1), Transport withdrew recognition from the Union and failed to provide relevant information that the Union requested. The ALJ rejected the General Counsel's other allegations.

The NLRB accepted virtually all of the ALJ's findings of fact and conclusions of law. Accordingly, the NLRB issued an order requiring Transport, among other things, to recognize the Union as the exclusive collective-bargaining representative of the employees in the appropriate unit; make contributions into the Union's pension, health and welfare funds on behalf of McCormack, O'Connor, and Taylor and make them whole for any losses attributable to Transport's failure to make the contributions; furnish the requested information to the Union; reinstate Anderson, McClain, and Golden to their former positions or substantially equivalent positions and make them as well as Carter and DeMoss whole for any loss of pay by reason of Transport's failure to timely reinstate them; and, provide information to the Un-

ion necessary to calculate the backpay due under the terms of the order.

Transport contests enforcement of the NLRB's order in three respects. First, because Transport provided a health and pension benefits plan to employees hired after the expiration of the collective bargaining agreement but before the strike, Transport argues that the employees were not harmed by Transport's failure to pay into the Union fund on behalf of the employees and are not entitled to any remedy. Second, Transport argues that it should not have to reinstate Anderson, McClain, and Golden or make whole any returning strikers because the ALJ's findings on these questions were not supported by substantial evidence on the record. Third, Transport contends that the ALJ's findings that Transport unlawfully failed to provide information to the Union and unlawfully failed to recognize the Union were predicated on significant errors.

## II. Discussion

"The General Counsel bears the burden of proving unfair labor practice allegations by a preponderance of the evidence." *Louisiana Dock Co. v. NLRB,* 909 F.2d 281, 286 (7th Cir.1990) (citing *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983)). Reviewing courts must not lightly set aside a decision by the NLRB that the General Counsel has met his burden. The NLRB's factual findings are conclusive if they are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *accord, e.g., Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1313–14 (7th Cir. 1991) *(en banc),* cert. denied, —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). The NLRB's legal conclusions are conclusive " 'unless they are irrational or inconsistent with the [Act].' " *David R. Webb Co. v. NLRB,* 888 F.2d 501, 503 (7th Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990). We will not disturb the NLRB's choice of remedies in the absence of abuse of discretion. *E.g.,*

*Graves Trucking, Inc. v. NLRB,* 692 F.2d 470, 474 (7th Cir.1982).

"Due deference to the findings of the [NLRB], however, does not mean abdication of our duty of judicial review." *Atlas Metal Parts Co. v. NLRB,* 660 F.2d 304, 308 (7th Cir.1981) (citing *inter alia Universal Camera,* 340 U.S. at 490, 71 S.Ct. at 466). We will not "rubber-stamp" the NLRB's order when our review of the record reveals that the record does not support portions of the order. *Id.*

### A. Fringe Benefits

Transport contends that it owes the Union health and welfare and pension funds nothing for McCormack, O'Connor and Taylor who were hired after the collective bargaining agreement expired but before the strike. Transport argues that the collective bargaining agreement, which had expired in 1985, was terminated when Transport implemented its terms of employment in September 1986, and Transport had no further obligation to persons hired thereafter. Furthermore, Transport argues that even if it should have made payments into the Union's fund, the NLRB cannot justify the order to pay. Each of the affected employees was covered by Transport's hospitalization and pension plans, and the NLRB has not shown that any of them suffered harm or prejudice from the alleged failure to make fund payments. Consequently, Transport argues, requiring Transport to make contributions would not be a remedy but the exaction of a penalty not permitted under the Act. We disagree with Transport and will address each of its arguments in turn.

### 1. Effect of Termination of Collective Bargaining Agreement

Even after the collective bargaining agreement expires, an employer may not unilaterally change the terms and conditions of employment subject to mandatory bargaining. *Louisiana Dock,* 909 F.2d at 286; *NLRB v. Emsing's Supermarket, Inc.,* 872 F.2d 1279, 1284 (7th Cir.1989). Instead, the employer must recognize the terms and conditions of the agreement that are subject to mandatory bargaining until a new agreement is in force or until the parties bargain in good faith to impasse. *Emsing's Supermarket,* 872 F.2d at 1285. After reaching an impasse, the employer can implement changes unilaterally "as long as the changes were previously offered to the union." *Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 293 (7th Cir.1987). Contributions to health, welfare and pension trust funds on behalf of employees are mandatory subjects of bargaining. *Allied Chemical & Alkali Workers v. Pittsburgh Plate and Glass Co.,* 404 U.S. 157, 159, 92 S.Ct. 383, 387, 30 L.Ed.2d 341 (1971). The ALJ found that Transport and the Union reached an impasse in September 1986 (ALJ Decision at 18). However, Transport had never proposed any changes regarding the health or pension benefits in the collective bargaining negotiations. Accordingly, in spite of the impasse, Transport was not free to unilaterally change the terms of the collective bargaining agreement which required weekly health and welfare as well as pension payments to the Union's fund. With this much, Transport implicitly agrees because Transport maintained its payments for all the employees who were part of the unit as of September 1986 when Transport and the Union reached an impasse. However, Transport never began making payments for McCormack, Taylor and O'Connor who were hired after September 1986. Therefore, Transport argues that it did not unilaterally "cease" making payments because its obligation to make health and pension payments for McCormack, Taylor and O'Connor never arose.

Transport is wrong for two reasons. First, McCormack, Taylor and O'Connor were part of the bargaining unit regardless of when they were hired, and under the contract they were entitled to the same treatment as all other unit employees. Transport entered the collective bargaining agreement with the Union as a representative of a unit of employees, not with the individual employees within the unit. When Transport implemented its own terms in September 1986, Transport had an obligation to the unit, not individuals, to

carry forward terms not discussed in prior negotiations. Accordingly, McCormack, Taylor and O'Connor as members of the unit were entitled to the same health and pension benefit payments to which the other employees in the unit were entitled. Second, the collective bargaining agreement specifically provided that the obligation to make payments ($30.00 per employee per week for the pension plan and $33.00 per employee per week for the health and welfare fund) "shall apply to new employees from the date of hire" and "shall continue during periods when the collective bargaining agreement is being negotiated." Transport continued to negotiate with the Union after September 1986 and had agreed to continue payments for unit employees during those negotiations. In short, Transport had no basis for failing to make payments for McCormack, Taylor and O'Connor even though they were hired after Transport had reached impasse in its negotiations with the Union.

### 2. Repayment Order

 In developing remedies for specific situations, the NLRB must draw on its expertise and restore the employees to the position they would have been in absent the employer's unfair labor practice. *NLRB v. Keystone Steel & Wire*, 653 F.2d 304, 307 (7th Cir.1981). The NLRB has broad discretion in constructing remedies to effectuate the policies of the Act. *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). A remedy must serve a legitimate remedial purpose under the Act, however, and must not be punitive. *U.S. Marine Corp.*, 944 F.2d at 1322. Transport argues that McCormack, Taylor and O'Connor have suffered no harm, so ordering Transport to "remit all contributions it failed to make to the Union's pension, health and welfare funds" penalizes Transport rather than remedying the effects of its unfair labor practice. We disagree.

To support its position, Transport relies on *Perry Coal Co. v. NLRB*, 284 F.2d 910 (7th Cir.), *cert. denied*, 366 U.S. 949, 81 S.Ct. 1903, 1904, 6 L.Ed.2d 1242 (1961), which is distinguishable from Transport's

case. In *Perry Coal Co.*, the employer terminated its contract with the charging union, Progressive Mine Workers of America (Progressive), on the contract's expiration date, refused to bargain with Progressive, and recognized a different union, United Mine Workers of America (UMW), as the collective bargaining agent for its employees. The NLRB found that the employer had violated the Act. *Id.* at 913. When the employer had recognized UMW, it had ceased payments to Progressive's health, welfare and pension fund, *id.* at 913, and began making payments to UMW's fringe benefits fund. *Id.* at 916. Part of the NLRB's remedial order therefore required UMW and the employer to jointly and severally " 'make whole employees for any loss suffered by reason of the discriminatory discontinuation of the Progressive Fund payments.' " *Id.* at 916. The court, however, found that this portion of the NLRB's remedy was penal and refused to enforce it. *Id.* at 917.

*Perry Coal Co.* differs from Transport's case because the employer in *Perry Coal Co.* had no legal obligation to make the payments to Progressive's fund. In *Perry Coal Co.*, the employer's obligation to make the payments into Progressive's fund arose from the employer's contract with Progressive. The *Perry Coal Co.* court noted that the employer made all payments required under its contract with Progressive until the contract expired. *Id.* at 916. However, the court also noted that the NLRB refused to reinstate Progressive's contract. *Id.* Implicitly, therefore, the NLRB concluded that the provisions of Progressive's contract were not still in force after the contract's expiration. The NLRB's remedy in *Perry Coal Co.* therefore went beyond returning the parties to the position they would have been in had the illegal recognition of UMW not occurred. The NLRB imposed a remedy that *presumed* a legal obligation to make payments existed after the expiration of the contract (when the employer began making payments to UMW) after implicitly concluding that a contractual obligation did not exist. The order to make the fringe bene-

fit payments served no remedial purpose. It was punitive and could not be enforced.

Transport, by contrast, did have a legal obligation to make payments to the Union at the time it withheld them. The NLRB found that Transport was legally bound to recognize the terms and conditions of employment contained in its contract with the Union after September 1986. Accordingly, by ordering payment, the NLRB's remedy merely sought to restore the *status quo ante.*

The Ninth Circuit rejected an argument similar to Transport's in *Stone Boat Yard v. NLRB,* 715 F.2d 441 (9th Cir.1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). In *Stone Boat Yard,* the employer had ceased making payments to the union's health, welfare and pension fund and implemented its own health insurance and pension plans without notice to the union after the union's unwarranted delay in bargaining. *Id.* at 443. The NLRB found that the employer's failure to give sufficient notice before ceasing payments to the union's fund violated sections 8(a)(1) and (5) of the Act. Consequently, the NLRB ordered the employer to make the overdue payments. *Id.* at 443. On petition for review to the Ninth Circuit, the employer argued that the remedy was punitive because it did not reflect employee loss and provided no offset for the benefits provided through the employer's plan. *Id.* at 446. The Ninth Circuit concluded that the company could not complain about the extra cost since the order required it to pay only what it had unlawfully withheld. Furthermore, "[e]ven if [the employer's] fringe benefit program met the present needs of its employees, the diversion of contributions from the union funds undercut the ability of those funds to provide for future needs." *Id.* at 446.

The Ninth Circuit's analysis in *Stone Boat Yard* applies equally well to Transport's case. Transport's failure to pay into the Union's fund for three employees differed from the employer's conduct in *Stone Boat Yard* only in the degree of impact that it had on the Union's fund. Although Transport provided benefits for McCormack, Taylor and O'Connor under its own fringe benefit plan, the diversion of funds from the Union's fund impacts the Union's ability to provide for future needs. Accordingly, an order to remit payments withheld constitutes a reasonable remedy for Transport's violation of sections 8(a)(5) and (1).[3]

## B. Failure to Reinstate Mechanics and Washers

Transport contends that substantial evidence on the record does not support the NLRB's order of reinstatement and backpay for Anderson, McClain and Golden and backpay for Carter and DeMoss. We disagree with Transport with regard to the mechanics (Carter, McClain, and Golden). However, we agree with Transport with regard to the washers (DeMoss and Anderson).

Transport and the NLRB agree on the basic principle of law applicable to the reinstatement of economic strikers.

> If, after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and to strike.... Accordingly, unless the employer who refuses to reinstate strikers can show that his action was due to "legitimate and substantial

---

**3.** As supplemental authority for its position, Transport referred us to *Manhattan Eye Ear & Throat Hosp. v. NLRB,* 942 F.2d 151, 158 (2d Cir.1991), where the Second Circuit refused to enforce the NLRB's order directing the employer to repay contributions withheld from the Union's fringe benefit fund and directed the NLRB to make specific findings as to the actual loss to the employees. In *Manhattan Eye Ear Throat Hosp.,* however, "there [was] little or no evidence to support the Board's conclusion that the [employees] retained any future interest in the [health, welfare and pension funds]." *Id.* at 157. The employees at issue were not even represented by the union at the time of the hearing, and the union had disclaimed any future interest in representing them. Without any concrete evidence of the employees' economic interest in the future of the fringe benefit funds, any harm to the employees was purely speculative. Transport has not argued that McCormack, Taylor and O'Connor lack any economic interest in the future stability of the Union's health, welfare and pension funds.

business justifications," he is guilty of an unfair labor practice. [citations omitted]. The burden of proving justification is on the employer....

NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967).

 Transport relies on two recognized "legitimate and substantial business justification[s]" for failing to immediately reinstate former economic strikers. First, the need of the employer to assure permanent employment to replacements so that the employer can obtain the necessary labor force to maintain operations during a strike justifies requiring replaced strikers to wait for reinstatement until a genuine vacancy occurs. Laidlaw Corp. v. NLRB, 414 F.2d 99, 105 (7th Cir.1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). The employer fulfills his obligation to offer full reinstatement only when he has offered a striker his former or a substantially equivalent job, even if the employee accepts a lesser or different position from his employer in the interim. David R. Webb Co. v. NLRB, 888 F.2d 501, 508 (7th Cir.1989). Second, an employer need not reinstate an employee to a position that the employer has eliminated during the strike to adapt to changes in business conditions. NLRB v. Lightner Pub. Corp., 128 F.2d 237, 241 (7th Cir.1942); NLRB v. Southern Florida Hotel & Motel Ass'n, 751 F.2d 1571, 1583 (11th Cir.1985). These justifications for failure to reinstate balance the interests of business and organized labor. Cf. Aqua–Chem, Inc. v. NLRB, 910 F.2d 1487, 1489 (7th Cir.1990), cert. denied, —— U.S. ——, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991) (referring to Laidlaw rights). While the General Counsel does not dispute the principles of law that Transport recites, he contends that the ALJ properly concluded that Transport did not present a legitimate and substantial business justification for its failure to reinstate former strikers.

A head count of the pre-strike and post-strike mechanics at Transport's facility serves as a springboard into the NLRB's decision regarding the reinstatement of the mechanics. Transport employed eight mechanics before the strike: O'Connor, McCormack, Carter, McClain, Fukar, Golden, Morrissey and Danhoff. Two mechanics worked during the strike (O'Connor and McCormack), and Transport hired three permanent replacement mechanics giving Transport a total of five mechanics during the strike. That left three unfilled positions at the end of the strike. Transport, however, filled only one of those positions with a former striker (Danhoff) and left two positions unfilled. Carter took a utility position, and when one of the replacement mechanics left in June 1987, Carter (the senior former striking mechanic) took a mechanic position. The ALJ found that all the permanent replacements were legitimately hired before the end of the strike.

 Relying on several intermediary findings, the ALJ rejected Transport's contention that it had eliminated two mechanic positions. On appeal, Transport points out some errors in the ALJ's intermediate findings. But on the whole, Transport offers little more than alternative interpretations of the evidence. Even if we agreed that Transport's interpretation of the evidence is reasonable, we could not adopt it because we must uphold the NLRB's choice between two fairly conflicting views of the evidence. Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464. We will address each of Transport's arguments in turn.

 First, Transport attacks the ALJ's credibility determinations. The ALJ noted that Schurer had initially telegrammed the Union that it had three mechanic positions open and then within 24 hours sent a second telegram stating that "[h]e had misstated the substantial amount of permanent replacements and the availability of work in view of the limited amount of equipment at the terminal during the strike." Although Schurer explained that between telegrams he had checked with his staff and discovered his mistake, the ALJ rejected the testimony as "uncorroborated and implausible." Furthermore, the ALJ found the second telegram to be "ambiguous, self-serving and more likely ... sent

to afford [Transport] some documentary protection for its refusal to recall the strikers." Although the telegram mentioned a reduction in the complement of equipment, Schurer testified at the hearing that there was no change in the complement of equipment before and after the strike. Noting that the strike lasted only ten days, the ALJ also rejected Schurer's uncorroborated assertion that Transport could reduce the number of mechanics because it learned to operate more efficiently during the strike. In response to these findings, Transport argues that Schurer's office was not at the facility so it is entirely plausible that he did not know the extent of permanent replacements hired or the extent to which the facility had managed to operate with fewer mechanics. Transport argues that it was plausible that Transport could conclude in ten days that increased efficiency eliminated its need for two mechanics. Credibility determinations, however, are outside our domain, and we will not second guess the ALJ. *E.g., U.S. Marine Corp.*, 944 F.2d at 1317.

■ Second, Transport confronts the ALJ's finding that Transport added utilitymen who did some of the work formerly handled by mechanics during and after the strike. In effect, the ALJ concluded that although Transport claimed that it "eliminated" mechanic positions, Transport circumvented its duty to hire back striking mechanics by shifting work from mechanics to utilitymen and hiring new employees into the utility positions without offering the utility positions to the returning striker mechanics. Although Transport maintains that the record shows mechanics did utility work, not that utilitymen did mechanic work, the record is open to conflicting interpretations. On the whole, the record shows that many of the tasks formerly performed by both mechanics and utilitymen became exclusively the tasks of utility-

men after the strike.[4] For example, one witness testified that some of the inspections formerly done by mechanics were shifted to utilitymen. We will not disturb the ALJ's reasonable inference that Transport engineered these shifts in responsibility to circumvent its duty to reinstate former strikers. *Cf., e.g., Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1093 (7th Cir.1987) (where the facts are open to conflicting inferences, we are not at liberty to draw an inference different from that of the Board even if it seems more plausible to us).

■ Third, Transport attempts to undermine the ALJ's finding that Transport vacillated about the number of available mechanic positions, which heightened the ALJ's skepticism regarding Transport's candidness. The ALJ noted that at the January 15, 1987 meeting, Schurer initially referred to two mechanic positions but one proved to be illusory since it was the working foreman's position which was not filled before the strike and which the Union and Transport agreed none of the strikers were qualified to fill. Transport points out that the ALJ misquoted the record and erroneously concluded that Transport did not notify the Union at the January 15, 1987 meeting about its plans to reduce the number of mechanic positions.[5] Nevertheless, even if Transport did not put the Union on notice of its intention to reduce the number of positions, notice would not satisfy the ALJ's overriding concern that Transport was less than forthright with the Union since Schurer vacillated before the meeting regarding the number of mechanic positions available. Moreover, even if Transport had notified the Union on January 15 of its plan to reduce the number of mechanics, it would not have affected the ALJ's final decision since the ALJ did not believe that Transport really "eliminated" the positions. Instead, the ALJ concluded that

---

4. While there is some dispute concerning precisely when these changes in responsibility occurred, there is substantial evidence that the changes did not take full effect until after the strike.

5. The witness did not testify that Transport indicated to the Union that Transport had no plans " 'to decrease the number of positions'," as the ALJ stated (ALJ Decision at 13). Instead, the witness testified that Transport indicated it "had no plans to *increase or decrease* the number of positions *then filled."*

Transport shifted mechanic work to utility-men, created two additional utility positions, and filled the two positions with new employees.

▇▇▇▇▇ Finally, even if Transport had legitimately eliminated the two mechanic positions, Transport did not fully comply with its duty to offer reinstatement to former strikers "[i]f and when a job for which the striker is qualified becomes available" because it failed to offer available utility positions to returning striking mechanics. Before the strike, Transport had one utilityman who worked through the strike. During the strike it hired an additional utilityman. In March 1987, Transport sent a letter to Carter, McClain, Fukar and Golden informing them that one of the utilitymen had resigned and that the position would be awarded to the most senior mechanic among them who responded to the letter. Carter took the position and later moved up into an available mechanic position. Neither Golden nor Fukar responded. McClain inquired whether Carter (who was senior to McClain) took the job. Other utility openings occurred later in the spring of 1987, and the total number of utilitymen increased to three, but Transport did not offer the positions to the former striker mechanics. The NLRB maintains that the "offer" in the letter did not extinguish the strikers' reinstatement rights, and they were therefore entitled to receive offers for later utility jobs. The NLRB determined that a telegram sent to four people at the same time announcing the availability of one job does not constitute a sufficient offer of reinstatement because it is not specific, unequivocal and unconditional. We uphold the NLRB's legal determination as rational and not incon-

sistent with the Act. A valid offer of reinstatement should consist of more than an announcement and invitation to apply. *Cf. Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 385 (D.C.Cir.1972) (generally cannot place the burden on the employees to let the employer know they want reinstatement).[6]

Substantial evidence on the record supports the NLRB's decision that Transport violated sections 8(a)(3) and (1) by failing to recall two mechanics, McClain and Golden, and failing to timely recall one mechanic, Carter. Therefore, we will grant the NLRB's application for enforcement of its order as it pertains to McClain, Golden, and Carter.

▇▇▇▇ The NLRB's order regarding the washers, however, rests on insufficient evidence. Three of the four washers, Anderson, DeMoss and Norwood, were permanently replaced during the strike. DeMoss eventually filled a washer position vacated by a permanent replacement, but Anderson and Norwood were not reinstated. The NLRB adopted the ALJ's finding that Anderson and DeMoss were qualified to work as utilitymen and should have been offered the utility positions as they became available. The ALJ noted that Anderson had held a utility position at Transport between 1983 and 1984, and his supervisor considered his performance good. DeMoss had been offered a utility position as late as six weeks before the strike. Neither Anderson nor DeMoss testified as to their qualifications to perform the tasks of a utilityman as those tasks were defined at the time that the strike ended. Nevertheless, the ALJ concluded that both Anderson and DeMoss were qualified to be utilitymen

---

**6.** The NLRB maintains that the record indicates that a mechanic position became available in 1988 (about the time of the hearing) that Transport failed to offer to the former strikers. The NLRB argues that even if the telegram constituted an offer, a former striker's rejection of tendered job different from his own does not forfeit his *Laidlaw* rights. *NLRB v. Rockwood & Co.*, 834 F.2d 837, 841 (9th Cir.1987). McClain, Fukar and Golden remained entitled to subsequent offers of available mechanic positions. Transport does not dispute that McClain, Fukar and Golden remained entitled to mechanic posi-

tions. However, Transport correctly points out that the testimony on which the NLRB relies does not indicate that a mechanic position became available in 1988. Transport was considering whether or not to fill the position and no ad had been placed at the time of the hearing. Nevertheless, Transport's failure to make valid offers of reinstatement in the utility positions to the striking mechanics sufficiently justifies the NLRB's finding that Transport did not comply with its obligation to offer reinstatement under the National Labor Relations Act.

but that no evidence indicated that Norwood was similarly qualified. Consequently, the NLRB ordered Transport to reinstate Anderson and to make DeMoss whole for failing to timely reinstate him.

The facts on the record do not sufficiently support the ALJ's conclusion that Anderson and DeMoss were qualified to perform utility work. The NLRB does not contend that the washers and the utilitymen perform substantially similar tasks but rather that DeMoss and Anderson had the qualifications to be utilitymen and therefore should have been hired as utilitymen after the strike. Regardless of Anderson and DeMoss's qualifications in the past, however, no evidence indicates that they were qualified to be utilitymen after the strike. In order to reach its conclusion regarding the mechanics, the ALJ accepted the General Counsel's contention that the utilitymen had taken on responsibilities previously performed by mechanics. In spite of these changes, the General Counsel adduced absolutely no evidence that Anderson and DeMoss were qualified to fulfill the new responsibilities of utilitymen. Given the changes in the utility position and Transport's witnesses' testimony that Anderson and DeMoss were not qualified to be utilitymen at the time the strike ended, we must conclude that the ALJ's finding in this respect is not supported by substantial evidence.

Accordingly, we decline to enforce the NLRB's order requiring Transport to reinstate Anderson and make whole Anderson and DeMoss for failing to timely reinstate them.

C. *Providing Information to the Union and Recognition of the Union's Majority Status*

The remaining two issues regard Transport's failure to provide relevant information to the Union and Transport's unlawful withdrawal of recognition from the Union in violation of sections 8(a)(5) and (1). The NLRB adopted the ALJ's finding that Schurer had failed to provide information requested by the Union at the February 17, 1987 meeting and that Transport withdrew

recognition of the Union as the collective bargaining representative on April 20, 1987. The NLRB also adopted the ALJ's conclusion that Transport failed to show either that the Union had in fact lost its majority status or that Transport had a reasonably grounded good faith belief that the Union no longer represented the majority of unit employees. Transport does not argue that the record does not support the NLRB's decision. Instead, Transport contends that because the NLRB's decision rests in part on its unfounded conclusions regarding the fringe benefits, the mechanics and the washers, the NLRB's decision is "predicated on significant errors." We disagree.

The ALJ made an independent finding, adopted by the NLRB, that Transport's failure to recognize the Union's majority status and Transport's failure to turn over relevant information to the Union violated the Act. The ALJ rejected Transport's contention that the number of prestrike employees who crossed the picket line and the number of replacement workers hired supported an inference that the Union had lost its majority status. Furthermore, the ALJ found no record support for Transport's contention regarding the Union's inaction in negotiation. The ALJ noted that Transport had otherwise violated the Act which militated against Transport's assertion that it acted in good faith. However, nothing in the ALJ's opinion suggests that he improperly predicated his decision about Transport's failure to recognize the Union or failure to give the Union relevant information on Transport's other violations of the Act.

### Conclusion

For the reasons stated above, we DENY the NLRB's application for enforcement of its order with respect to Anderson and DeMoss, but GRANT the application in all other respects.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

I join nearly all of the panel's cogent opinion, but dissent from the portion that

declines to enforce the NLRB's order to make washer James DeMoss whole for Transport's failure to timely reinstate him. That decision rests upon the conclusion that there is insufficient evidence in the record to support the ALJ's finding, adopted by the Board, that DeMoss was qualified to perform utility work. While the factual issue posed is a close one, we must bear in mind Congress' admonition that the Board's findings of fact are "conclusive" so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see generally Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). That is to say, our standard of review is deferential; we may neither "dabble in fact-finding [nor] displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case *de novo." NLRB v. P\*I\*E\* Nationwide, Inc.,* 923 F.2d 506, 513 (7th Cir.1991).

The Board's finding that washer DeMoss was qualified to perform utility work clears this admittedly low evidentiary hurdle. It is undisputed that Roscoe Stajkovich, a superintendent at Transport, offered DeMoss a utility position six weeks prior to the strike. At the evidentiary hearing before the ALJ, Stajkovich shifted gears, claiming that DeMoss was no longer qualified for the position. The ALJ reflected upon Stajkovich's testimony as follows:

> Given Stajkovich's admitted offer to DeMoss, I am hardly persuaded and reject [his] belated assessment. Overall, I found the testimony of Stajkovich to be conclusionary [sic], elusive and considerably less forthright as evidenced by his inability to state whether he was serious when he made his offer to DeMoss.

ALJ Op. at 14. What the ALJ put delicately we will state bluntly: the ALJ believed that Stajkovich lied when he testified that DeMoss was unqualified to perform utility work after the strike. This is a credibility determination to which we must attribute "significant weight." *E.g., Kopack v. NLRB,* 668 F.2d 946, 953 (7th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982). I accordingly conclude that the ALJ was justified in finding that if Transport had deemed DeMoss qualified to perform utility work six weeks prior to the strike, DeMoss was also qualified to do so after the strike. The situation of washer Paul Anderson is different, for the evidence pretty clearly demonstrates that the skills required of utility workers in 1987 had evolved significantly since Anderson held a utility position in 1984.

I would enforce the Board's order as to washer DeMoss.